Argued January 12; reversed January 24, 1939

## CARTER *v.* HOWARD

(86 P. (2d) 451)

H. E. *Slattery*, of Eugene, for appellant.

S. M. *Calkins*, of Eugene, for respondent.

KELLY, J. Plaintiff, a married woman, is the mother of two children. Defendant is a physician and surgeon engaged in the practice of medicine and surgery at Eugene. A short time before the birth of her second child, plaintiff employed defendant to render her medical and surgical service and care during her confinement and lying-in period. The child was born on the 5th day of January, 1936. Plaintiff alleges that defendant failed and neglected to give her any care or attention subsequent to said last-named date, although plaintiff was and remained a patient at the Nelson Maternity Home, at which said child was born, until January 15, 1936. Eight specifications of negligence on defendant's part are set forth in plaintiff's amended complaint:

1. Failure to make any examination of plaintiff upon the day immediately following the birth of said child.

2. Failure to visit plaintiff or do anything for her on the 7th day of January, 1936, although plaintiff was suffering with a fever of 104 degrees, of which defendant was notified and because of which defendant was requested to visit plaintiff.

3. Failure to visit plaintiff or to do anything for her during January 8, 9, and 10, 1936, during which time her fever continued.

4. That on January 11, 1936, plaintiff's fever continued and she was very weak and exhausted. Defendant was notified of her condition and requested to visit her and to do something to assist her, but he failed to do anything for her.

5. That on January 14, 1936, defendant, knowing plaintiff's weak, exhausted and feverish condition, advised plaintiff's husband that it was all right to remove plaintiff from said maternity home in Eugene to the home of plaintiff's aunt in West Fir a distance

of 41 miles and because of defendant's advice plaintiff was so moved in an automobile on January 15, 1936, and thereby caused great pain, discomfort and bodily weakness.

6. Failure, neglect and refusal as hereinbefore stated on defendant's part to do anything for plaintiff after January 5, 1936, while plaintiff remained at said maternity home.

7. That sometime during plaintiff's lying-in period and while plaintiff was a patient at said maternity home in Eugene, defendant permitted plaintiff to become infected with some disease germ which permeated and was diffused through her whole body; that defendant knew of said infection and was requested to treat her and to render her medical assistance for the removal of said germ and disease; and that defendant refused to do anything for plaintiff.

8. That when defendant was notified of the plaintiff's condition during her lying-in period, and requested to visit her, plaintiff was suffering with some kind of infection, the name and nature of which is unknown to plaintiff, and defendant knew that she was so suffering with said infection. That by the use of reasonable care, diligence and skill defendant could have ascertained her condition, and could have rendered unto her such medical assistance as she required; but defendant utterly failed to visit her or to do anything for her.

The amended complaint also alleges that as a result of defendant's negligence, carelessness and failure to use reasonable diligence and skill in caring for her during the time and times above specified, plaintiff has suffered and does suffer as thereinafter set forth.

At the conclusion of plaintiff's case in chief, the trial court entered an order of involuntary nonsuit.

510

Defendant contends that there is no substantial evidence of the negligence charged or any of it, and also, that there is no evidence that anything defendant did or failed to do was the proximate cause of injury to plaintiff. The present very serious condition of plaintiff is not questioned.

As to the defendant's failure to attend plaintiff in person, at the maternity home subsequent to January 5, 1936, plaintiff testified to that effect saying that on January 6, defendant came to the door of the room occupied by plaintiff and standing at the threshold talked to the attending nurse about the baby, but made no examination of plaintiff; and thereafter defendant did not visit plaintiff while she was at the maternity home. In this, she is corroborated by a woman who gave birth to a baby on January 6, 1936, and who occupied the same room as plaintiff during the last nine days plaintiff remained at the maternity home. This woman testified that during that time defendant did not come into the room. She also testified that she heard plaintiff ask the nurse to request defendant to come and see plaintiff; and that the nurse telephoned saying: "Is this Dr. Howard?" and "Mrs. Carter isn't feeling well and she would like to see you."

As to plaintiff's temperature on January 7, 1936, plaintiff is corroborated by her husband to the effect that the thermometer disclosed that plaintiff had a temperature of 104 degrees on that day; that at 4 p. m. of that day he heard the nurse call the defendant and ask him to come and see plaintiff and that he remained by his wife's bedside until 8 p. m. and defendant did not put in an appearance. Mr. Carter testified that upon the following day the nurse took plaintiff's temperature and it was 102 degrees. Plaintiff's mother

testified that when the baby was six days old, which was on the 11th day of January, 1936, plaintiff had a fever and she, plaintiff's mother, told defendant that plaintiff was not feeling as well as she should and plaintiff wanted him to go see her.

Dr. J. G. Radabaugh, a practicing physician and surgeon of forty-one years, experience was called as a witness in behalf of plaintiff. We quote from his testimony:

"Q. The evidence shows in this case that this plaintiff's baby was born January 5, 1936, and the next morning the doctor who was taking care of her looked into the room, standing in the door, and made inquiry about the baby, but he didn't examine the plaintiff or make any inquiry, and on the 7th he was notified by telephone that she had a fever and was not feeling well and six days afterwards the mother of the plaintiff told the doctor that the girl wasn't getting along well and wanted him to go see her, but he didn't visit the plaintiff at any time after he looked in the door the morning of the 6th. What would you say as to whether that was proper treatment in a confinement case?

A. Well, I wouldn't think—I couldn't say that it was exactly. No sir, I couldn't say that it was.

Q. Would you say it was improper?

A. Well, I wouldn't treat a case like that myself.

Q. How?

A. I wouldn't treat a case like that myself if I was notified of it.

Q. Was that proper treatment?

A. No, I wouldn't think so."

The negligence charged is not mistreatment, but nontreatment. It is not a question whether some prescription, which was given, should not have been given or some course of treatment undertaken should not have been had; but the question here is whether the

defendant was negligent in failing to do anything even so much as to look at his patient.

■ Taking the record as it is, barren of any explanation on defendant's part, we think that a prima facie case is made by plaintiff upon the issue of defendant's alleged negligence.

■■ In discussing the question whether a sufficient showing appears in the record upon the issue of proximate cause, it is well to bear in mind the degree of proof required of plaintiff in order to render her cause invulnerable to a motion for nonsuit.

"The degree of proof required of a plaintiff, who, in order to obtain a favorable judgment, must sustain the material issues involved, is generally classed as a probability. If, when he rests his case, the facts which were incumbent upon him to establish, appear from the evidence as merely possible, the court, upon motion of the adverse party, should grant a judgment of nonsuit for failure to prove a material issue. When, however, after the plaintiff rests his case, it appears from his evidence that the facts devolving upon him to make manifest are quite probable, his cause has passed the danger point of a nonsuit, and, together with the defendant's evidence, if ordered, should be submitted to the jury for them to determine the credibility of the witnesses and the weight of the testimony, by comparing and considering the balancing probabilities." Patty v. Salem Flouring Mills Co., 53 Or. 350, 357, 98 P. 521.

The case at bar must also be distinguished from those cases of alleged malpractice where the patient is suffering from injury or disease when the physician is called to attend him. Here we have a case wherein the testimony before us is susceptible of no other conclusion than that when defendant was employed by plaintiff, plaintiff was in good health. Her need of attendance by a physician arose only because of the natural process of approaching childbirth.

Upon her cross-examination, when first called as a witness, plaintiff testified, inter alia, as follows:

"Q. Mrs. Carter, I only have a very few questions to ask you: You remember I was up at your house and talked with you once before, so I know almost everything you will testify to. Now, I think you testified then and I assume you do now that you never had any flow of pus or blood or anything of that sort from the vaginal area?

A. No.

Q. There has never been any disorder so far as anything coming out through the orifice that the urine comes through?

A. No.

Q. You have never had any trouble with your urine at all, have you?

A. Well, no, not lately.

Q. Well, I mean in the way of blood or pus?

A. No.''

After other witnesses testified, plaintiff, by permission of the court, was examined further as follows:

"Direct examination by Mr. Slattery:

Q. Now, state as to whether or not after your baby was born you ceased to flow? Yes or no?

A. No, I quit flowing on January 9. After that, there was not much discharge and what there was was pus. There was no blood after that.

Q. On the 9th of January you discharged pus from your vagina?

A. Yes.

Cross-examination by Mr. Calkins.

Q. Do you know whether you discharged pus or not?

A. Yes.

Q. You see I had examined you twice and in each instance you told me there had been no discharge of pus from your vagina?

A. Well, what I mean is when I was there at the Maternity Home. When you asked me that I thought you meant now, but when I was at the maternity home there was.

Q. Immediately after your child's birth?

A. Yes.

Q. But that ceased right away?

A. It went on until after I went back to the hospital.

Q. How long was that?

A. That was on the 9th that that began.— The Court: Can you speak a little louder?

A. That was on the 9th that the pus began to flow on the discharge, the pus then and that continued until after I went back to the hospital on January 17th.

Q. Mr. Calkins: Do you remember I asked you particularly about that at the former examination.

A. I don't remember it.

Q. And I asked you about it here.

A. Well, if you asked me, I thought you meant now.''

Upon this state of the record, it is urged by defendant that plaintiff's testimony is so contradictory that it should be disregarded.

■ To this point, we are cited to the authorities reviewed in the case note entitled: ''Direction of verdict; effect of explanatory testimony of witness to deprive other testimony given by him of all probative effect.'' 66 A. L. R. 1517. The cases there cited deal largely with irreconcilable contradictions by the party holding the affirmative of the issue; mere negative testimony given on direct examination and contradicted or rendered valueless by explanations made upon cross-examination; and with testimony so at variance with established facts as to be unworthy of credence. In the case at bar, we have a witness, who on each of the occa-

sions of her testifying, had become enfeebled by long continued illness and suffering, and who at last testified that her former answers were given under a misunderstanding as to the particular time to which reference was made in the questions then propounded. Under the facts of this case, we cannot say that, as a matter of law, the testimony of this witness should be disregarded.

The testimony discloses that on January 15, 1936, plaintiff by consent of defendant, was taken from the maternity home at Eugene to her aunt's house at West Fir. Two days later, that is on the 17th day of January, plaintiff had a bad chill and high temperature and fainted. Later in the evening of the 17th of January, 1936, plaintiff was taken to the Eugene hospital. On the 18th, plaintiff's left hip began to bother her. On January 23, 1936, defendant performed a surgical operation upon plaintiff. Plaintiff testified that after this operation, defendant said in plaintiff's hearing that one of plaintiff's ovaries was infected and that he had removed plaintiff's appendix.

On February 24, defendant performed another operation upon plaintiff, opening up the back part of the affected hip so that it might drain. The defendant said then that he had found a large amount of pus in the affected part.

On March 29, 1936, plaintiff was taken out of the Eugene hospital to the home of her husband's parents at Lowell, a distance of about 25 miles from Eugene.

On April 27, 1936, plaintiff was taken back to the Eugene hospital remaining there until August 29, 1937.

The trial of this case in the circuit court began on March 7, 1938. Dr. Radabaugh testified that during

the two months prior thereto, he had examined plaintiff. When asked to describe what he found, he said:

"Well, I found the patient very much emaciated, running a little temperature, no appetite, had a couple of running sores on the left hip; one opening at the back of the hip and one at the top of the hip, and the one at the back is about closed at present and the other one is still open and is about three and half inches in length and about three inches in width. The depth I couldn't say because I haven't probed it but it looks to me like it is about three inches or four inches in depth."

In discussing the question whether the record discloses sufficient evidence of negligence on defendant's part to justify the submission of that question to the jury, we quoted a hypothetical question propounded to Dr. Radabaugh and the doctor's answers thereto. Immediately following that part of Dr. Radabaugh's testimony, the following questions were propounded to him and he made the following answers:

"Q. Now, I have described her condition to you, What would you say as to whether or not that if the doctor had treated her and given her proper treatment that would have alleviated her condition?
A. Well, it might, yes.
Q. What is the probability.
A. Well, it probably would have.
Q. That is, he probably could have arrested that condition if he had given her proper treatment?
A. He might, yes.
Q. What is the probability?
A. Well, probably would, or could."

In the light of these facts and the opinion testimony of Dr. Radabaugh, we are unable to say that plaintiff has failed to meet the requirement as to the degree of

proof necessary to avoid an order of nonsuit. In other words, we hold that the showing made by plaintiff takes her case out of the realm of mere possibility and places it within the scope of probability.

In *Lippold v. Kidd*, 126 Or. 160, 269 P. 210, 59 A. L. R. 875, cited by defendant, consideration was given to the question whether the failure of a physician to remove a sliver of steel from the eye of plaintiff rendered the physician liable in damages. This court held that there was no evidence that when plaintiff came to defendant, plaintiff's eye was capable of rehabilitation. The distinction between that case and the one at bar is obvious. In the instant case, as far as this record discloses, plaintiff was not suffering from any injury or disease. In effect, Dr. Radabaugh testified that probably her discomfort and suffering could have been alleviated by defendant, if he had given plaintiff proper attention. In the Lippold-Kidd case, it is said with respect to the degree of proof of proximate cause "As we have said before, certainty is not required; probability will suffice."

In *Spain v. Oregon-Washington R. & N. Co.*, 78 Or. 355, 153 P. 470, Ann. Cas. 1917E, 1104, also cited by defendant, the court considered the question of the cause of alleged aggravation of a wound caused by amputation of the hand. The wound was unhealed and discharging pus when plaintiff was committed to jail. He contended that the condition of his arm was aggravated by the unsanitary condition existing in the jail. This court held that there were several inferences which could have been drawn as to the cause of the aggravation and that the most probable was that it was a mere phase of the infection already shown to exist. In the case at bar, there is not the slightest showing that plaintiff suffered infection when she entered the maternity

home, and there is no testimony tending to show an unsanitary condition at the maternity home, or any treatment or practice upon plaintiff on the part of the nurse or any attendant in the home which would or could cause infection.

*Merriam v. Hamilton*, 64 Or. 476, 130 P. 406, also cited by defendant, is a case where this court held that the record disclosed that plaintiff had no injury or disease and despite the fact that the defendant physician erroneously diagnosed her case as pregnancy, she suffered no actionable injury. In brief, the doctrine of that case is that a doctor is not liable for damages in failing to treat a patient in any particular way who has no known ailment, and acquired none by reason of the treatment actually given. It is conceded that in the case at bar, plaintiff is seriously afflicted. It is conceded that when she engaged defendant to care for her, she was pregnant; and while pregnancy is not a disease nor an injury, but a natural condition for a married woman, the attendance of an accouching physician at childbirth is always desirable and usually imperative.

The case of *Ewing v. Goode*, 78 Fed. 442, also cited by defendant, is one wherein defendant was engaged to treat plaintiff for an eye malady. During part of the period of alleged neglect, it affirmatively appears that defendant had made provision for the attendance of a competent oculist in case of a call. During the earlier part of such period, defendant presumed, because he had not been called, that plaintiff was following the precautionary and alleviating prescriptions he had given her. In other words, the character of the treatment appears rather than an entire failure to attend the patient at all. Moreover, it was not shown that any treatment would have been effective.

We have freely discussed the facts appearing in evidence herein and have referred to and quoted from the opinion evidence of the physician who testified. In doing so, it must be understood that we have given weight and value thereto only to the extent necessary to determine whether a nonsuit should have been ordered. No part of defendant's version of this case appears in the record and we expressly disclaim any thought of discrediting or prejudging it.

The judgment of nonsuit is reversed and the cause is remanded for such further proceedings as may not be inconsistent herewith.

RAND, C. J., and ROSSMAN and BEAN, JJ., concur.