[L. A. No. 22036. In Bank. Oct. 19, 1951.]

HARRY E. CHAMPION, Appellant, v. FREDERICK A. BENNETTS et al., Respondents.

Sheppard, Mullin, Richter & Balthis, Gordon F. Hampton and E. Talbot Callister for Appellant.

Charles E. Beardsley, Bodkin, Breslin & Luddy, Henry G. Bodkin, Richard L. Oliver, Fred Girard, Hirson & Horn, Theodore A. Horn, Edward Feldman, Belli, Ashe & Pinney, Melvin M. Belli, Ryan & Ryan, Thomas C. Ryan, Mancuso, Herron & Winn, John W. Herron, J. F. Shirley, Vernon W. Humber and James F. Boccardo, as Amici Curiae on behalf of Appellant.

Reed & Kirtland and Henry E. Kappler for Respondents.

EDMONDS, J.—Dr. Frederick Bennetts, with Dr. Glen Gummess assisting him, performed a surgical operation upon Harry Champion at the California Lutheran Hospital. Charging that a rubber tube negligently was left in the incision with resulting injury which required the removal of the left testicle, Champion sued the hospital and the surgeons, claiming damages for the asserted malpractice. The appeal of Champion is from a judgment entered against him notwithstanding the verdict of a jury in his favor against Dr. Bennetts.

Champion alleges that he consulted Dr. Bennetts concerning severe pain in the scrotum. Dr. Bennetts diagnosed the ailment as varicocele, and advised an operation. In the course

of performing the operation, Dr. Bennetts "negligently and carelessly deposited and left a rubber tube within the scrotum of plaintiff, and negligently and carelessly closed said incision and sutured the same." Because of the tube, Champion suffered severe pain, hysteria, and a swelling and splitting of the scrotum both at the incision and otherwise. The complaint further states that the negligent enclosure of the tube caused an infection in the scrotum which required the removal of the left testicle, with consequent shortening of life expectancy and sterility. Damages are also sought for loss of earnings during Champion's incapacity.

By his answer, Dr. Bennetts admits that he operated upon Champion. He states that a rubber tube was placed in the scrotum, but he denies the other facts alleged in the complaint.

The record shows evidence tending to prove the following facts:

Dr. Bennetts diagnosed Champion's difficulty as varicose veins and he advised surgery for the removal of them. Dr. Bennetts said, "It is a simple operation, you will be confined from three to seven days, your total convalescence should not be over three weeks." Champion stated that he did not wish to lose his left testicle. Dr. Bennetts assured him that, "If the testicle is healthy there will be no occasion for that; you will have to leave that up to me, however."

The operation was performed by Dr. Bennetts, assisted by Dr. Gummess. Dr. Bennetts made a 4-inch incision in the left upper scrotum, dissected certain varicose veins and removed them. Following the operation, Dr. Bennetts told Champion's mother that the left testicle was "a little smaller than the other one but it appeared healthy and he did not take it out."

The notes of the nurse attending Champion show that on the following day he complained of considerable pain and the scrotum had begun to swell. The tape holding the operative dressings was severed to relieve the pressure.

On the next day, the swelling had increased to such an extent that it was necessary for an interne to remove the operative dressings, replacing them with a small pad or cloth over the scrotum. Champion testified that he could then see the scrotum "very plainly." He described it as swollen and discolored, and in a position of elevation over the abdomen. The operative incision was sewed tightly, he said; there was no drainage from the scrotum, and nothing protruded from it.

Administration of penicillin was then begun and dosages were continued for two days. Two witnesses who observed Champion during this time testified that they saw no wound other than the main operative incision with nothing protruding from the scrotum.

Six days after the operation, Dr. Bennetts told Champion that he had decided to probe the wound for the purpose of establishing drainage. When asked what the trouble was, the doctor stated that "nothing was wrong"; "it could be a thrombosis." He probed the incision by inserting surgical forceps, and ordered Champion to take sitz baths.

A witness testified that he assisted Champion in taking the recommended sitz baths. He told the jury that he then observed the entire scrotum. The opening which had been established through probing was on the left side of it and gave off an odor. As he described the operative area, there was only the one wound on the entire scrotum with nothing protruding from it.

After two weeks in the hospital Champion was taken to his home. He was instructed to continue taking sitz baths, use hot compresses, and to walk as much as possible. His mother helped him to take sitz baths and cleaned and dressed the operative incision. She saw no opening in the scrotum other than that established through probing, and did not observe anything protruding from it. Her description of the incision was substantiated by the testimony of a neighbor.

About a month after the operation, Champion was examined by Dr. Bennetts in the latter's office. When questioned about a red area at the top of the scrotum, the doctor stated that he thought an abscess was developing. He instructed Champion to apply hydrogen peroxide to the wound and to cleanse it with swab sticks. Two days later, while cleansing pus from the probe wound, Champion and his mother noticed, deep in the wound, the edge of a substance which resembled "a muscle." Upon touching this substance with the swab stick, about an inch of white rubber tube protruded.

On the following morning, the rubber tube stuck to a dressing and came out. Champion and his mother described it as being "very wet and full of pus." This was the first time either Champion or his mother knew that a rubber tube had been inserted in his scrotum. Champion immediately telephoned Dr. Bennetts who said: "That is fine. I left it for a drain. I am glad you found it."

On the following day, Dr. Bennetts examined Champion and stated, "That is the first time that ever happened to me." He then advised Champion that a further operation would be necessary; the left testicle would have to be removed. About a week later Dr. Bennetts again examined Champion and said, "This kind of thing hasn't happened to me before," and again urged an operation.

Dr. Bennetts, assisted by Dr. Gummess, performed the second operation. The left testicle was removed, a drainage tube was inserted, its presence being indicated on the operative report. Several days later, the drain was removed and Champion left the hospital.

Concerning the first operation, Dr. Bennetts testified that he had placed a rubber tube in Champion's scrotum for drainage purposes. He described it as being attached to the wall of the scrotum by sutures, part of the tube protruding from a "stab wound" made in the lowest part of the scrotum. He admitted, however, that he told no one except Dr. Gummess of the tube. He did not tell the internes or nurses of its presence, and "overlooked" mention of the tube or stab wound in making his operative report, although it called for pertinent information on drainage. When asked whether the tube might have slipped entirely inside the scrotum, Dr. Bennetts replied that such was ". . . within the realm of possibility . . ."

Dr. Gummess substantiated Dr. Bennetts' testimony as to the insertion of the tube but said that he did not see it at any time when he examined the patient following the operation. As a practicing specialist in urology, Dr. Gummess was asked whether ". . . in an operation for the removal of a varicocele, under proper medical and surgical practice here, would a physician and surgeon intentionally permit a wound to close, leaving a rubber tube within the scrotum, with no part of the rubber tube protruding?" He replied, "No, he would not."

It was further established, by expert testimony, that drainage of scrotal wounds is a mandatory rule because "proper drainage will prevent infection." Two experts identified the pain and other symptoms of disease in Champion's scrotum after the operation as "classical signs" and "indications" of infection, which indicates bacterial attack upon living tissue. Dr. Bennetts admitted that there was infection present in the incision which was draining; that the draining involved the testicle, the spermatic cord and scrotum. Such infection, he said, can make tissue become necrotic.

Upon this evidence the jury returned a verdict in favor of Champion against Dr. Bennetts, exonerating Dr. Gummess and the hospital. Subsequently, the motion of Dr. Bennetts for judgment notwithstanding the verdict as to him was granted. The appeal of Champion challenges only the ruling of the court as to Dr. Bennetts; no complaint is made in regard to the judgments in favor of the other parties to the action.

A defendant's motion for judgment notwithstanding the verdict ". . . may properly be granted only when, disregarding conflicting evidence and indulging in every legitimate inference which may be drawn from plaintiff's evidence, the result is a determination that there is no evidence sufficiently substantial to support the verdict." (*Devens* v. *Goldberg*, 33 Cal.2d 173, 177-178 [199 P.2d 943].) Relying upon this rule, Champion contends that the evidence, disregarding conflicts, and the legitimate inferences to be drawn from it furnishes sufficient support for the jury's implied finding that Dr. Bennetts was negligent in performing the varicocelectomy, which negligence proximately caused the subsequent removal of the testicle with resulting damages.

The record fully supports Champion in this regard. From the evidence presented by the respective parties the jurors reasonably might have concluded that the rubber tube was completely enclosed within the scrotum at the time of the operation, and the incision tightly sutured. If, however, they chose to believe that Dr. Bennetts left the tube protruding, there is ample evidence tending to prove a failure to fasten it so as to prevent withdrawal into the scrotum, a possibility admitted by Dr. Bennetts.

Under either view of the evidence, it shows a surgical procedure which permitted the operative incision to become tightly closed, leaving the rubber tube completely within the scrotum. Dr. Rosenbloom testified that "It is a rule, it is a mandatory rule, that we always drain scrotal wounds . . ." The evidence would justify a conclusion that Dr. Bennetts violated this "mandatory rule" by failing to drain the scrotum during the period following the surgery, either because he made no provision for drainage or because he permitted the drainage tube to slip into the scrotum and the operative incision to close completely.

There is no merit to the contention that the evidence fails to establish a causal relation between the failure to properly provide for drainage and the subsequent necessity

for removal of the testicle. ██ "The law does not require that negligence of the defendant must be the sole cause of the injury complained of in order to entitle the plaintiff to damages therefor. All that is required . . . is that the negligence in question shall be *a* proximate cause of the injury . . ." (*Griffith* v. *Oak Ridge Oil Co.*, 190 Cal. 389, 392 [212 P. 913].) ██ It was shown that at the time of the first operation Champion's testicle was healthy and for that reason Dr. Bennetts did not take it out. Yet, 42 days later, it was in such condition that removal was deemed necessary. Although Dr. Bennetts argues to the contrary, the jury's implied finding that a causal relationship existed was not purely speculative. According to the medical testimony, the reason for the "mandatory rule" of drainage is the danger of infection. That testimony also characterized Champion's symptoms following the operation as "classical signs" and "indications" of infection and unquestionably it was a necrotic condition which necessitated the second operation.

The judgment entered upon the order granting judgment notwithstanding the verdict of the jury is reversed with directions to the trial court to enter judgment upon the verdict in favor of Champion.

Gibson, C. J., Shenk, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.