296 P.2d 452

John WALKER and Greta Walker, Husband and Wife, Plaintiffs-Respondents,

v.

Edward K. DISTLER, Defendant-Appellant.

No. 8294.

Supreme Court of Idaho.

March 2, 1956.

As Modified on Denial of Rehearing

May 7, 1956.

J. F. Martin and C. Ben Martin, Boise, for appellant.

40

Wm. F. Galloway, J. W. Galloway, R. C. Galloway and Ted M. Echols, Boise, for respondents.

TAYLOR, Chief Justice.

Plaintiffs (respondents) brought this action to recover damages for personal injuries suffered by the plaintiff, Greta Walker, during childbirth, while she was under the control and care of the defendant (appellant), a physician and surgeon.

In their complaint plaintiffs' cause is stated in three counts. The first is based on negligence of the defendant and seeks to invoke the doctrine of res ipsa loquitur. The second charges that "defendant wrongfully, negligently, carelessly and in an unskillful manner administered spinal anesthesia to said plaintiff". Specific acts of negligence and want of skill are alleged, among which are that the anesthetic chosen by the defendant was not a proper one for use in connection with childbirth, and for use in her case, in view of her symptoms and general condition, and that the anesthetic was negligently and unskillfully administered. Specific injuries alleged to have resulted therefrom include partial and increasing paralysis, and foot drop, of the right leg; total paralysis with atrophy of the thigh and calf, and foot drop, of the left leg; and impairment of control of bladder and bowels. The third count charges assault and battery.

The administration of the drug and the delivery occurred July 27, 1951. Plaintiff at the time was 19 years of age and had suffered a miscarriage the year before.

In his answer defendant alleges that the plaintiff, Greta Walker, was not at the time in good physical condition and had not been for sometime prior thereto, notwithstanding his efforts to prepare her for a normal delivery; that he used his best

skill, judgment and care in her treatment and delivery, all in accord with good, sound medical practice; that during the delivery and the after-care of plaintiff he used not only his best judgment, but consultations with and advice of well-known physicians and surgeons, and that the disabilities suffered by plaintiff were unpredictable and unavoidable and within the realm of hazards incident to childbirth.

Upon trial, after plaintiff had rested, the court denied non-suit on the first count and granted non-suit on the second and third counts.

At the close of the evidence, after both parties had rested, the court granted motion for directed verdict, and entered judgment for the defendant. Thereafter plaintiffs moved for a new trial, which was granted. The grounds specified in the notice of motion for a new trial are: (1) accident or surprise; (2) newly discovered evidence; (3) that the order directing a verdict is against the law in that there was sufficient evidence to support a verdict for plaintiffs; (4) errors in law occurring at the trial: (a) the granting of motion for non-suit as to plaintiffs' third count; (b) sustaining objections to plaintiffs' examination of the witness Litzinger, head nurse, concerning hospital charts in other cases where spinal anesthesia was employed.

In its order the court granted the motion upon all of the grounds assigned except that assigning error in law in granting non-suit as to plaintiffs' third count. Defendant brought this appeal from the order.

No cross-appeal was taken by plaintiffs. Hence, the non-suit as to the third count is not before us.

It was developed upon the trial that in July, 1950, while one William J. Kelly was her doctor, the plaintiff, Greta Walker, suffered a miscarriage, and that the delivery of July 27, 1951, was her first. The defendant, testifying in his own behalf, interposed defensively that he had been advised by Dr. Kelly, who had referred the patient to defendant, that she exhibited symptoms of pre-eclampsia at the time of the miscarriage and that such symptoms might develop during the course of the current pregnancy; that he saw her frequently between the time she came to him in April and the date of delivery; that during that time she was overweight and gaining too rapidly in spite of his efforts to keep her weight down; that he did an urinalysis upon each visit and, except for obesity, with a concurrent increase of blood pressure, and some anemia, he observed no other symptoms of pre-eclampsia until July 19th, when she complained of occasional headaches, and some ankle swelling appeared; that an urinalysis done at his office on the afternoon of July 26th showed 2-plus albumin; that he then became suspicious of eclampsia and sent her to the hospital. That evening he induced labor and eighteen hours later, shortly after noon on the 27th, he administered a saddle block, or spinal anesthesia, in the spinal canal between the fourth and fifth lumbar ver-

42

tebrae; opened the cervix by incision and delivered the baby with forceps.

Defendant further testified that toxemia, pre-eclampsia or eclampsia, is a disease caused by toxic products released from the placenta during pregnancy and carried by the blood to the different parts of the body. As the baby grows, more of such products are pushed out, resulting in sickness of the mother, and specifically "you will notice that by the appearance of headaches, dizziness, and albumin in the urine, and when you come to albumin and headaches you think of eclampsia. * * * As soon as the mother begins to complain of headaches and dizziness or spills albumin in the urine, you immediately *pi*ck up your ears and begin to suspicion something is happening," and if the toxic condition develops to the point of eclampsia, convulsions, and death will follow unless the pregnancy is terminated and the uterus cleaned out immediately.

"Q. All right. When you put her in the hospital on the afternoon of July 26th, 1951, what did her urinalysis show? A. She had a 2-plus albumin.

"Q. What did that mean to you, Doctor? A. That means that she was going into eclamptic failure.

"Q. How long does it take them to go into an eclamptic condition when they start like that? A. Oh, that can happen very suddenly.

"Q. What do you mean by suddenly? A. Well, a woman can be perfectly—she can be apparently normal at noon and be—be spilling albumin by two o'clock. Whenever the produce—whenever the substance within the blood stream gets high enough they go into eclampsia.

"Q. How long after this eclampsia sets in is some accident going to happen? A. Usually within twenty-four hours. You have to deliver a baby within twenty-four hours."

There was other medical evidence to the effect that the albuminuria is a sine quo non of eclampsia. The doctor's defense was that in her condition the plaintiff could not have endured a general anesthetic, such as ether. During the eighteen hours of labor preceding the saddle block, the cervix did not dilate rapidly enough; that the patient became tired, and the fetal heart tones increased from a normal rate of 140 to 160; that he was therefore confronted with an emergency in which it was necessary and advisable to use a spinal anesthetic because it could be administered and become effective in a matter of minutes. He described caudal anesthesia as an anesthetic given in the sacral canal, which extends down below the lumbar vertebrae and contains the nerve fibers from the spinal cord, but not within the spinal canal. That in such anesthesia the spinal canal is not punctured, that the anesthetic solution is deposited in the cauda equinal area and that it is used "to anesthesize just those

areas around the birth area, the birth canal, the opening of the birth canal and it is a very safe and long-acting anesthesia. It has one major difficulty, and the reason that it is not used is it requires constant supervision and it takes a long time. Caudal analgesia is never used when there is any time element. If you have to deliver a baby quickly you don't give a caudal because the baby will be born before the caudal is given or takes effect. You can give a spinal in one-tenth the time that it takes to set up and institute a caudal anesthesia." On direct examination he had testified that in the case of a caudal anesthesia it would be necessary to wait ten to twenty minutes before it took effect. "Caudal anesthetics therefore take considerably more quantity and time than a spinal. You can give a spinal in one-fifth the time you can give a caudal. Caudal would have been fine if I would have had time to deliver this baby, two hours to deliver this baby."

Defendant's testimony indicates that during the eighteen hours labor he was hoping for complete dilation and a non-surgical delivery. At the time he was examining her immediately before the saddle block was given, he said, "she didn't have any convulsions." After the anesthetic and while preparing for delivery he first observed signs of convulsion and he delivered the baby between convulsions. This would support the doctor's defense that he was confronted with an emergency justifying the spinal anesthesia. But also inherent in his testimony is the inference that by commencing two hours earlier he could have employed the comparatively safe caudal anesthesia with the probability of thus avoiding the injury sustained by plaintiff.

Plaintiff produced in support of her case the hospital chart containing the history of her symptoms, diagnosis and treatment from the time of admission to discharge. One entry under date of the 26th, at 5:30 p. m., is "Urine to lab.", understood to mean that a sample of her urine was sent to the hospital laboratory for analysis. The laboratory report contained in the exhibit is dated the 27th and records, "Albumin neg." In rebuttal to defendant's testimony of the presence of 2-plus albumin on the 26th, plaintiff called the director of the hospital laboratory who made the analysis reported in the chart. This witness produced the laboratory copy of the analysis and testified that "albumin neg." meant that he found no albumin in the specimen sent to the laboratory. In surrebuttal the defendant testified that the laboratory report was based upon a sample of urine taken by catheter after the delivery on the 27th, at which time, he explained, there would be no albumin, the placenta having been removed. Following this the plaintiff in surrebuttal asked permission to recall the laboratory director, for the purpose of determining which specimen of urine was referred to in the exhibit. This request was denied by the court, and the directed verdict followed.

Plaintiffs' motion for a new trial is supported by the affidavits of one of her counsel, Wm. F. Galloway, William J. Kelly, the doctor who had cared for her during the first five months of her term, and of John L. Sundberg, hospital administrator.

The Galloway affidavit alleges affiant was surprised by the testimony of the defendant that Dr. Kelly had advised him plaintiff showed symptoms of pre-eclampsia at the time of her miscarriage and during the forepart of her present term, because in interviews which affiant had with defendant over a period of two years before the trial, the defendant had talked freely of plaintiff's condition, but had never mentioned any indication of eclampsia; and that affiant had discovered that the urinalysis report made by the laboratory director was based upon a specimen taken within two hours after plaintiff's entry into the hospital on the 26th.

In his affidavit Dr. Kelly states that plaintiff came to him in June, 1950, for care in connection with her then pregnancy which resulted in a miscarriage July 4, 1950. "That this miscarriage was not accompanied by any abnormalities, such as headaches, dizziness or any evidence of eclampsia. * * * that during his observation, treatment and care of Mrs. Greta Walker she had no abnormalities or trouble other than those usually found in a woman with her first pregnancy, and that this includes the first pregnancy which miscarried, as well as the second pregnancy which started in the fall of 1950, and which was the rea-son for her being cared for during the ensuing months, and at the time she was referred to Dr. Distler in April of 1951; and that during this later pregnancy she was progressing satisfactorily without any evidence of eclampsia."

The Sundberg affidavit states that the urinalysis reported in the hospital chart under date of July 27, was of a specimen taken July 26th within two hours after plaintiff entered the hospital.

In opposition to motion for a new trial, the defendant presented a subsequent affidavit by Dr. Kelly in which he repudiated his prior affidavit, explaining that he did not know "the affidavit was for the court purposes and to be used in the above entitled cause", as though that should make a difference. It would appear that the witness should be subjected to examination and cross-examination in open court.

Defendant also procured an affidavit from the hospital administrator, Sundberg, in which he likewise repudiated his previous affidavit, stating that he had no personal knowledge as to what specimen of urine was covered by the analysis reported July 27th.

It is obvious that the presence or absence of albumin in the urine of the patient on the afternoon of the 26th is a most important item of evidence as to the existence of pre-eclampsia, and the emergency which defendant relies upon to justify the spinal anesthesia. The trial court should have permitted the plaintiffs to re-

call the laboratory director on surrebuttal, as they proposed, in order to settle the question as to what specimen was referred to in his report. See Lawless v. Calaway, 24 Cal.2d 81, 147 P.2d 604.

Further, in regard to surprise, it is noted that defendant's answer does not plead pre-eclampsia, overweight, dizziness, headaches, tension, albuminuria, or any other sympton thereof. It alleges merely that at the time of delivery and for some-time prior thereto she was not in good phys-ical condition. So, plaintiffs were not ad-vised before trial that the presence of al-bumin and an eclamptic emergency would be presented in defense. This is not to say that the defendant was required to plead more. It is, however, a showing of sur-prise taken in connection with counsel's averment that in previous conversations with the defendant no mention had been made of such matters. In view of this sit-uation the trial judge apparently concluded that the ends of justice would be served by granting a new trial. Fairbanks v. Fair-banks, 59 Idaho 1, 80 P.2d 17. Having in mind the following rules obtaining in this jurisdiction, we think the record supports the order.

Except in cases where error, affect-ing the substantial rights of the aggrieved party, is so manifest as to entitle him to a new trial as a matter of right, the trial judge is vested with a wide discretion to be exercised wisely in granting or denying a new trial, and the order of the court exer-cising that discretion will not be disturbed by this court unless such discretion clearly and manifestly has been abused. Jones v. Campbell, 11 Idaho 752, 84 P. 510; Stone v. Matthies, 49 Idaho 277, 287 P. 951; Pos-ton v. Hollar, 64 Idaho 322, 132 P.2d 142; Baldwin v. Ewing, 69 Idaho 176, 204 P.2d 430; Hall v. Johnson, 70 Idaho 190, 214 P. 2d 467; Financial Credit Corp. v. Douglas, 71 Idaho 312, 230 P.2d 1002.

"The trial judge sees the witnesses on the witness stand, observes the man-ner of their testifying, notes their ap-parent candor or fairness, or the want of it; hears the argument of counsel, and, in short, is in possession of many sources of information valuable in an inquiry as to whether justice has mis-carried or not, and which cannot be made to appear in the record of the case which comes to the appellate court; and, appreciating such fact, ap-pellate courts have so frequently held, that it may be announced as settled law, that trial courts possess a discretion to be exercised wisely in the granting or refusal of new trials, and that such dis-cretion will not be by the appellate court disturbed unless it manifestly and clearly appears to have been exercised unwisely and to have been manifestly abused. Such has been the holding of this court in many cases." Say v. Hodgin, 20 Idaho 64, at page 68, 116 P. 410, at page 411.

"An order granting a new trial will not be reversed on appeal, if it can be

justified upon any of the grounds upon which the motion was made." Turner v. First Nat. Bank of Bancroft, 42 Idaho 597, at page 603, 248 P. 14, at page 16.

"Such a view is the logical concomitant of the universally accepted doctrine that, upon proper motion, a trial judge should, notwithstanding a substantial conflict in the testimony, grant a new trial, if he is satisfied that the verdict is against the weight of the evidence; and, even though there be no conflict in the testimony, the probative force and effect of the evidence is ultimately for the determination of the trial court upon the hearing of a motion for a new trial." Tidd v. Northern Pacific Ry. Co., 46 Idaho 652, at page 656, 270 P. 138, at page 139.

█ We have also adopted the further rule, in cases involving appeals from orders granting a new trial, that the record will be liberally construed in support of the order, for the obvious reason that such order does not finally conclude the rights of the parties. In MacDonald v. Ogan, 61 Idaho 553, at page 556, 104 P.2d 1106, at page 1107, speaking through Mr. Justice Ailshie, the court said:

"It should be remembered that, in passing upon a motion for a new trial, the appellate court applies a different rule to the consideration of an order *granting a new trial* from what it ap-

plies to the *denial of a new trial.* This difference is predicated on the grounds that, where a new trial is granted, both parties are put back in the status in which they found themselves on the original trial; and each party has his chance to present the case anew to the court and jury. Whereas, an order denying a motion for a new trial terminates the case and denies the losing party any chance of resubmitting his case or having it again heard by the court and jury."

In Fredricksen v. Luthy, 72 Idaho 164, at page 168, 238 P.2d 430, at page 432, Mr. Justice Thomas stated the rule thus:

"Appellate courts are more reluctant to interfere with an order granting a new trial than with an order denying a new trial; a much stronger showing is necessary to obtain a reversal where a new trial has been granted than in instances where it is denied. * * * Clark v. Fazio, 191 Or. 522, 230 P.2d 553; 5 C.J.S., Appeal and Error, § 1619, page 522, Notes 83–84."

And in Sanchotena v. Tower Co., 74 Idaho 541, at page 547, 264 P.2d 1021, at page 1024:

"This court applies a different and more liberal rule when considering an order of the trial court *granting a new trial* than it applies when the trial court *denies a new trial.* * * * When a new trial is granted the parties are placed in the same status as they found

themselves on the original trial, with an opportunity to present the case to the court and jury again.

"This court has, in such cases as this, committed itself to the rule that where the trial court entertains the opinion that the verdict is not in accord with law or justice, Poston v. Hollar, supra [64 Idaho 322, 132 P.2d 142]; Egbert v. Twin Falls Canal Co., 52 Idaho 39, 42, 11 P.2d 360, * * * it may grant a new trial."

Appellant urges the record is insufficient to support the verdict for the plaintiffs for the reason that plaintiffs produced no expert medical testimony showing negligence or want of skill in his diagnosis and treatment of plaintiff, Greta Walker, and for that reason the directed verdict was proper and a new trial should not have been granted.

■ Generally speaking, negligence in malpractice cases must be established by expert medical testimony. This is so because the causative factors are not ordinarily within the knowledge or experience of laymen composing the jury. Engelking v. Carlson, 13 Cal.2d 216, 88 P.2d 695; Annotation 141 A.L.R. 5; Annotation 141 A.L.R. 111; 7 Wigmore on Evidence, 3rd Ed., 453, § 2090.

■ However, the plaintiffs are entitled to the benefit of any expert testimony produced by the defense, Trindle v. Wheeler, 23 Cal.2d 330, 143 P.2d 932; Lashley v. Koerber, M.D., 26 Cal.2d 83, 156 P.2d 441; Mitchell v. Saunders, 219 N.C. 178, 13 S.E. 2d 242, and plaintiffs have the right to cross-examine the defendant as a medical expert. R9-1206, I.C. Lawless v. Calaway, 24 Cal. 2d 81, 147 P.2d 604

■ There are exceptions to the general rule which permit the plaintiff in a malpractice case to invoke the doctrine of res ipsa loquitur. Among these are cases in which the surgeon has left a foreign object, such as a sponge or surgical instrument, within the body of the patient. In these cases the negligence involved is said to be within the experience and knowledge of laymen. Moore v. Ivey, Tex.Civ.App., 264 S.W. 283; Annotation 141 A.L.R. 111; Annotation 162 A.L.R. 1265. See Reinhold v. Spencer, 53 Idaho 688, 26 P.2d 796.

The doctrine has also been applied in cases where common knowledge alone may not be sufficient to enable a layman to say the accident is of a kind which ordinarily does not occur in the absence of negligence. In such cases the evidence produced is considered and, if it furnishes a sufficient basis of information from which a lay jury can reasonably conclude that the accident is of a kind which normally does not occur unless someone was negligent, the doctrine is applied. Lashley v. Koerber, M.D., 26 Cal.2d 83, 156 P.2d 441; Dierman v. Providence Hospital, 31 Cal.2d 290, 188 P.2d 12; Hurt v. Susnow, Cal.App., 192 P.2d 771; Cavero v. Franklin General Benev. Soc., 36 Cal.2d 301, 223 P.2d 471; Zentz v. Coca Cola

48

Bottling Co., 39 Cal.2d 436, 247 P.2d 344; Costa v. Regents of University of California, 116 Cal.App.2d 445, 254 P.2d 85; Farber v. Olkon, 40 Cal.2d 503, 254 P.2d 520; Bauer v. Otis, 133 Cal.App.2d 439, 284 P.2d 133; Seneris v. Hass, 45 Cal.2d 811, 291 P. 2d 915; Mitchell v. Saunders, 219 N.C. 178, 13 S.E.2d 242; Woronka v. Sewall, 320 Mass. 362, 69 N.E.2d 581; Bowles v. Bourdon, 148 Tex. 1, 219 S.W.2d 779, 13 A.L.R. 2d 1.

General precedents considered: Osborn v. Cary, 28 Idaho 89, 152 P. 473; McAlinden v. St. Marie's Hosp. Ass'n, 28 Idaho 657, 156 P. 115; Swanson v. Wasson, 45 Idaho 309, 262 P. 147; Evans v. Bannock County, 59 Idaho 442, 83 P.2d 427; Willis v. Western Hosp. Ass'n, 67 Idaho 435, 182 P.2d 950; Hagan & Cushing Co. v. Washington Water Power Co., 9 Cir., 99 F.2d 614; Union Pac. R. Co. v. Stanger, 9 Cir., 132 F.2d 982; Ayers v. Parry, 3 Cir., 192 F.2d 181; Inderbitzen v. Lane Hosp., 124 Cal.App. 462, 12 P.2d 744, 13 P.2d 905; Jordan v. Skinner, 187 Wash. 617, 60 P.2d 697; Ybarra v. Spangard, 25 Cal.2d 486, 154 P.2d 687, 162 A.L.R. 1258; Fritz v. Horsfall, 24 Wash.2d 14, 163 P.2d 148; Champion v. Bennetts, 37 Cal.2d 815, 236 P.2d 155; Dees v. Pace, 118 Cal.App.2d 284, 257 P.2d 756; Edwards v. West Texas Hosp., Tex.Civ.App., 89 S. W.2d 801; Richeson v. Roebber, 349 Mo. 132, 159 S.W.2d 658, 141 A.L.R. 1; Annotation 13 A.L.R.2d 11.

■ It is not necessary and we do not decide whether on the record before us plaintiffs were entitled to the aid of the doctrine of res ipsa loquitur. It is sufficient here to say the record is not so conclusively against its application as to require us to hold the trial court abused its discretion in granting a new trial. Furthermore, since application of the doctrine may depend upon the evidence to be produced on a new trial, we should not, and cannot, decide the issue on this appeal.

■ The witness Litzinger had testified that spinal anesthesia was currently in use by staff physicians in obstetrical cases, and produced charts of other patients at request of counsel. Reasonable examination of her to show whether or not the other cases were all obstetrical, or for other reasons were not comparable, should have been permitted, and could have been done without violating the policy of § 9–203, I.C.

Order affirmed. Costs to respondents.

PORTER, J., and BECKWITH, D. J., concur.

KEETON, J., concurs in the conclusion reached.

SUTPHEN, D. J., dissents.

Petition for rehearing denied.

SUTPHEN, D. J., dissents.