625 P.2d 407

**Marciena J. MAXWELL and Bobby E. Maxwell, husband and wife, Plaintiffs-Appellants,**

v.

**The WOMEN'S CLINIC, P.A., and Murray G. Stromberg, II, individually as a member thereof, Defendants-Respondents.**

**No. 13620.**

Supreme Court of Idaho.

March 18, 1981.

**54**

William F. Lee, Boise, for appellants.

Richard E. Hall, of Moffatt, Thomas, Barrett & Blanton, Boise, for respondents.

DONALDSON, Justice.

Plaintiffs-appellants Mr. and Mrs. Maxwell brought a medical malpractice suit against defendants-respondents the Women's Clinic, P.A., and Dr. Stromberg. The Maxwells alleged that the defendants improperly and negligently failed to advise Mrs. Maxwell of certain risks of a laparoscopic tubal ligation surgical procedure and improperly and negligently performed that surgical procedure by burning a hole in Mrs. Maxwell's small intestine necessitating additional surgery. Besides the pain and loss of a portion of the small intestine to Mrs. Maxwell, they alleged that the additional surgery caused Mr. Maxwell to be deprived of his wife's services, comfort, society and companionship during her surgery and extended recovery.

Mr. Maxwell's deposition describes as follows a conversation he had with Dr. Stromberg in which the appellants allege that Dr. Stromberg admitted negligence:

"Q. And would you relay what you remember saying yourself, and what Dr. Stromberg said to you?

A. Dr. Stromberg introduced himself to me and said that they would need to do additional surgery. And I remember saying something about it. And he said, the way I remember it, he said, *I obviously messed up on the first one, and another surgery has to be done to repair the damage* . . . .

. . . .

Q. In testifying here today as to what Dr. Stromberg said to you, do you recall his exact words?

A. No, not exactly. I do remember him saying, *I obviously messed up.* Other than that, I don't remember too much more about it." (emphasis added).

Mr. Maxwell further stated that nobody else overheard the above statement.

Additionally, Dr. Stromberg did not bill the Maxwells for his services in either the laparoscopic tubal ligation or for his assistance during in the exploratory laparotomy performed by Dr. Lung. He explained his nonbilling by stating he did not wish to contribute to the Maxwells' financial hardship since he was concerned for their circumstances.

Defendants moved for summary judgment on the grounds that there were no issues of material fact and they were entitled to judgment as a matter of law. In the defendants' memorandum supporting their motion for summary judgment, they argued that the consent form signed by Mrs. Maxwell indicates adequate notice, that a reasonable person in Mrs. Maxwell's position would have undergone the surgery notwithstanding the advice of possible complications and that plaintiffs have failed to provide expert testimony to refute defendants' experts that the operations were within required standards. The defendants also filed affidavits by Dr. Gerhard and Dr. Stromberg, physicians and surgeons practicing in the field of obstetrics and gynecology. Dr. Stromberg asserted in his affidavit that he performed the surgery in a manner consistent with the medical standards of care applicable in Boise, Idaho, at the time the operation was performed, and that the injury which Mrs. Maxwell suffered could have occurred in the absence of negligence on his part. Dr. Gerhard's affidavit stated that based on his review of the medical records

that Dr. Stromberg did not deviate from the applicable medical standards and that this injury could have occurred without any negligence on the part of Dr. Stromberg.

Plaintiffs resisted the motion by arguing, among other things, that whether Mrs. Maxwell's consent was informed was still at issue and that the statement attributed to Dr. Stromberg and his nonbilling were direct expert testimony.

The district court granted defendants' motion for summary judgment on the basis that plaintiffs offered no medical or expert testimony that the defendants negligently failed to meet the applicable standard of health care practice of the community. Plaintiffs appeal arguing that Dr. Stromberg's statement and actions constitute an admission of medical malpractice and qualify as expert testimony.

This Court has often stated:

" ... [T]hat summary judgment should be granted only when the pleadings, depositions and admissions, together with affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law. The facts are to be liberally construed in favor of the party opposing the motion, who is also to be given the benefit of all favorable inferences which might be reasonably drawn from the evidence." (citations omitted). *Huyck v. Heckla Mining Co.*, 101 Idaho 299, 300, 612 P.2d 142, 143 (1980).

Additionally, in *Walker v. Distler*, 78 Idaho 38, 47, 296 P.2d 452, 457–458 (1956) this Court stated that:

"Generally speaking, negligence in malpractice cases must be established by expert medical testimony. This is so because the causative factors are not ordinarily within the knowledge or experience of laymen composing the jury. [citations omitted].

. . . .

However, the plaintiffs are entitled to the benefit of any expert testimony produced by the defense, [citations omitted], and plaintiffs have the right to cross-examine the defendant as a medical expert."

Cited in *LePelley v. Grefenson*, 101 Idaho 422, 614 P.2d 962 (1980); *Hall v. Bacon*, 93 Idaho 1, 453 P.2d 816 (1969); *Schofield v. Idaho Falls Latter Day Saints Hospital*, 90 Idaho 186, 409 P.2d 107 (1965); *Flowerdew v. Warner*, 90 Idaho 164, 409 P.2d 110 (1965).

*LePelley, supra,* held that plaintiffs in a medical malpractice action could not complain about the granting of summary judgment against them when no expert testimony favoring their position had been *offered.* This Court in *LePelley, supra,* reviewed the application of I.C. §§ 6–1012 and 6–1013, which were passed by the Idaho legislature as part of retroactive and prospective medical malpractice emergency legislation. 1976 Idaho Sess. Laws, ch. 277. The legislature in enacting this legislation stated its purpose as follows:

"It is the declaration of the legislature that appropriate measures are required in the public interest to assure that a liability insurance market be available to physicians, hospitals and other health care providers in this state and that the same be available at reasonable cost, thus assuring the availability of such health care providers for the provision of care to persons in the state. It is, therefore, further declared to be in the public interest that the liability exposure of such health care providers be limited and made more definable by a requirement for direct proof of departure from a community standard of practice." 1976 Idaho Sess. Laws, ch. 277, § 1, p. 951.

I.C. § 6–1012 states in part that:

"[I]n any case, claim or action for damages due to injury or death of any person, brought against any physician and surgeon or other provider of health care, including, without limitation, any ... hospital ..., such claimant or plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony ... that such defendant then and there negligently failed

to meet the applicable standard of health care practice of the community . . . [1976, ch. 277, § 2, p. 951.]"

I.C. § 6–1013 sets forth requirements which the expert witness testimony must meet to be admissible including

"(a) that such an opinion is actually held by the expert witness, (b) that the said opinion can be testified to with reasonable medical certainty, and (c) that such expert witness possesses professional knowledge and expertise coupled with actual knowledge of the applicable said community standard . . . [1976, ch. 277, § 3, p. 951.]"

■ Therefore, in order to preclude summary judgment in medical malpractice cases, plaintiffs must show that expert testimony has been *offered* by either the plaintiff or defendant which when viewed in a light most favorable to plaintiffs indicates that the defendant has negligently failed to meet *the applicable standard of health care practice of the community. LePelley, supra; Walker, supra.* In the case at bar, the alleged admission of the defendant doctor, equivocal at best, does not satisfy the standards set out in I.C. §§ 6–1012 and 6–1013. Furthermore, both of the medical experts that submitted affidavits stated that injury to the bowel is an inherent and unavoidable risk in laparoscopic tubal ligation which can and does occur in the absence of negligence on the part of the physician performing the surgery. In fact, both experts indicated in affidavits submitted on behalf of the respondents that Dr. Stromberg had performed the operation within the standard of care of the community. Nothing is offered to refute this testimony other than Mr. Maxwell's testimony regarding Dr. Strom-

berg's alleged statement and Dr. Stromberg's admitted nonbilling of the Maxwells. However, this evidence,[1] even when construed in a light most favorable to the Maxwells, does not reasonably infer that Dr. Stromberg negligently failed to meet the applicable standard of health care practice of the community. Therefore, we affirm the district court's granting of summary judgment.

Costs to respondents. No attorney fees awarded.

BAKES, C. J., and SHEPARD, J., concur.

BISTLINE, Justice, dissenting.

The first question is whether admissions of medical malpractice by a defendant physician can constitute the direct expert testimony needed to show malpractice. If the answer to this question is negative, then the inquiry in this case is at an end. If the answer is affirmative, however, then a second question is whether the alleged statements in this case are sufficient to constitute admissions of medical malpractice. If sufficient, then the trial court erred in granting summary judgment.[1]

I.

The overwhelming weight of authority holds that extrajudicial admissions can supply the necessary expert testimony in malpractice cases.[2] The court in *Jarboe v. Harting,* 397 S.W.2d 775 (Ky.App.1965), after noting the general rule "that expert testimony is required in a malpractice case to show that the defendant failed to conform to the required standard," noted that "it is a generally accepted proposition that

---

1. Although the respondents do not contest the admissibility of the alleged statement under the rules of evidence, they do contest the admissibility of the nonbilling. Since the statement and nonbilling together would not be sufficient to create the required inference about failing to meet the community standard, it is unnecessary for us to decide this issue.

1. The trial court granted summary judgment on the grounds that the Maxwells had failed to introduce any expert testimony of medical malpractice.

2. Although Idaho now has a statutory requirement of direct expert testimony, I.C. § 6–1012, the Court observed in *LePelley v. Grefenson,* 101 Idaho 422, 614 P.2d 962 (1980), that this statute merely codified the existing case law which required such testimony. The case law from other jurisdictions shows that extrajudicial admissions are considered to be direct expert testimony.

the necessary expert testimony may consist of admissions by the defendant doctor." *Id.* at 778. Similarly, the court in *Robertson v. LaCroix*, 534 P.2d 17 (Okl.App.1975), stated that "[i]t is well settled in Oklahoma and elsewhere that the extra-judicial admission of a party opponent has the same legal competency as direct expert testimony to establish the requisite elements of a prima facie case of negligence in a medical malpractice action." *Id.* at 21. *Accord, Lashley v. Koerber*, 26 Cal.2d 83, 156 P.2d 441, 444 (1945) ("extrajudicial admissions of defendant [in a malpractice case] have the same legal competency as direct expert testimony to establish the critical averments of the complaint"); *Sheffield v. Runner*, 163 Cal.App.2d 48, 328 P.2d 828, 830 (1958) ("[w]hile expert testimony is required in a case of this sort to establish the standard of medical practice in the community, this evidence may be found in the testimony of the defendant physician, and his extrajudicial admissions have the same affect as direct expert testimony"); *Wickoff v. James*, 159 Cal.App.2d 664, 324 P.2d 661, 664 (1958) ("[t]he expert testimony which will establish plaintiff's prima facie case [in a medical malpractice action] may be that of the defendant, and an extrajudicial admission is sufficient to do this"); *Greenwood v. Harris*, 362 P.2d 85, 88 (Okl.1961) ("the extrajudicial admissions of a defendant physician are competent to supply the expert testimony required to make out a prima facie case as against a demurrer to the evidence"); 70 C.J.S. Physicians & Surgeons § 62 at 1008 (1951) ("[t]he expert testimony which establishes plaintiff's prima facie case [in a malpractice action] may be that of defendant, and extrajudicial admissions of defendant have the same legal competency as direct expert testimony to establish the critical averments of the complaint"). *See also Tully v. Mandell*, 269 Mass. 307, 168 N.E. 923 (1929); *Zettler v. Reich*, 256 A.D. 631, 11 N.Y.S.2d 85 (S.Ct.), *affirmed*, 281 N.Y. 729, 23 N.E.2d 548 (1939); 1 Washburn L.J. 615 (1962).

The Court first holds, however, that "the alleged admission of the defendant doctor, equivocal at best, does not satisfy the standards set out in I.C. §§ 6–1012 and 6–1013." This Court in *LePelley v. Grefenson*, 101 Idaho 422, 425, 614 P.2d 962, 965 (1980), held, with regard to the requirement of expert testimony, that "the legislature codified already existing case law," as "[t]he need for expert testimony in a medical malpractice case was well established prior to enactment of this legislation." Case law from other jurisdictions shows that extrajudicial admissions are considered to be direct expert testimony.

As for the requirements for direct expert testimony set out in I.C. § 6–1013, these do no more than set forth the foundation for expert testimony. To testify for a plaintiff as an expert one must have an opinion to a reasonable medical certainty and one must have the required expertise and knowledge of the community standard. Again, this does no more than codify existing case law. Obviously a statement by a doctor practicing in the community that he was negligent qualifies as direct expert testimony of negligence, both under the statute and case law.

It should also be noted that one of the two medical experts mentioned by the Court as stating that this injury was an inherent and unavoidable risk is none other than defendant Stromberg himself. Stromberg's affidavit establishes his qualifications and that he knows the community standard, thus his alleged admission definitely constitutes direct expert testimony of malpractice. The only question is whether the alleged statement sufficiently shows that Stromberg failed to meet the applicable standard of health care practice in the community.

## II.

The Court further states that this alleged statement does not show that "Stromberg negligently failed to meet the applicable standard of health care practice of the community." [3]

---

3. This statement by the Court is totally dicta. Once having held that the alleged statements do not meet the standards of the statute, any further statement is unnecessary.

In his deposition, Mr. Maxwell stated that Dr. Stromberg said "I obviously messed up on the first one, and another surgery has to be done to repair the damage." Plaintiffs in answering interrogatory no. 39 stated "[t]hat after performing said surgery, Defendant Stromberg stated to Plaintiff Bobby Maxwell that he had obviously made a mistake in the performance of the tubal ligation in that he thought he had burned a hole in Plaintiff Marciena Maxwell's intestine and that Dr. Lung was going to perform an operation to correct said burn hole." These statements, when construed in a light most favorable to the Maxwells, present a question for the jury as to whether Stromberg negligently failed to meet the applicable standard of health care practice of the community. Cases from other jurisdictions support this conclusion.

The court reversed a judgment of nonsuit in a very similar case in *Wickoff v. James,* 159 Cal.App.2d 664, 324 P.2d 661 (1958). Because of the similarity of the issue, I quote at length:

"In considering whether or not a judgment of nonsuit was proper, an appellate court must 'resolve every conflict in their testimonies in favor of plaintiff, consider every inference which can reasonably be drawn and every presumption which can fairly be deemed to arise in support of plaintiff, and accept as true all evidence adduced direct and indirect, which tends to sustain plaintiff's case.' *Lashley v. Koerber,* 26 Cal.2d 83, 84, 156 P.2d 441, 442. In any malpractice case negligence on the part of the doctor will not be presumed, it must be proved except in those cases where res ipsa loquitur is applicable. The expert testimony which will establish plaintiff's prima facie case may be that of the defendant, and an extra judicial admission is sufficient to do this. However, in order for an extra judicial admission to be sufficient it must be an admission of negligence or lack of skill ordinarily required for the performance of the work undertaken. *Lashley v. Koerber,* supra.

"*The only statement of Dr. James' which could be construed as an admission of negligence is the statement, 'Boy, I sure made a mess of things. * * * '* Webster's New International Dictionary (2d ed.) gives one of the definitions of the word mess as 'A confused or disagreeable mixture of things; a hodgepodge. Hence, a situation resulting from blundering or from misunderstanding; a muddle; a botch.' Roget's Thesaurus (Crowel Publishing Co., 1946), under the heading 'unskillfulness,' gives the phrase 'make a mess of.' Partridge, a dictionary of slang and unconventional English (4th ed. 1951), states the phrase 'make a mess of' means bungle. The Oxford English Dictionary defines the phrase 'to make a mess of' as bungle. All these definitions indicate that *one of the meanings of the phrase is bungle or botch, which in turn connotes a job done in an unskillful manner.*

"Respondents argue that even if the admissions of Dr. James were significant they were not sufficient to prevent a nonsuit in the instant case, and that these admissions do not support an inference of negligence. They state further that even if they are wrong in this respect, appellant still cannot prevail because such evidence has been characterized as the most unreliable and uncertain evidence that can be produced. However, we are here concerned with the question of whether or not a nonsuit should have been granted, and in such a case a plaintiff is entitled to every favorable inference that may reasonably be drawn from the evidence. *What inferences were to be drawn from said statements of Dr. James in the light of the facts and circumstances shown by the evidence was a question of fact to be determined by the jury and we believe that the court erred in determining as a matter of law that no inference of negligence could be drawn from the evidence. We think that the jury could infer from the statement of Dr. James that in inserting the scope he did*

*not use the degree of care ordinarily exercised by other doctors of good standing in the community,* and, as a result of the lack of care, Mrs. Wickoff's bowel was torn. Under such circumstances it was error to grant a nonsuit." 159 Cal.App.2d 664, 324 P.2d at 663–64 (emphasis added).

In *Greenwood v. Harris,* 362 P.2d 85 (Okl. 1961), the doctor misdiagnosed the plaintiff as having a tumor instead of being pregnant. The plaintiff's husband testified that the doctor came out of the operating room and said "[y]our wife is approximately three to three and a half months pregnant, this is a terrible thing I have done, I wasn't satisfied with the lab report, she did have signs of being pregnant. I should have had tests run again, I should have made some other tests.... I am sorry." *Id.* at 88. The court held as follows:

> "The only question remaining in connection with such admissions is the sufficiency thereof to establish negligence. These admissions as shown by the record are quoted above. We can interpret these statements in no other way than as an admission that a faulty diagnosis had been made due to the failure of the defendant to use and apply the customary and usual degree of skill exercised by physicians in the community."

The court held that the trial court erred in sustaining a demurrer at the conclusion of plaintiff's evidence.

In *Sheffield v. Runner,* 328 P.2d 828 (Cal. App.1958), there was testimony that the defendant doctor before the patient's death stated "[t]his is a hospital case ...", while after her death he stated "I should have put her in the hospital." *Id.* at 830. The court held that these two statements were sufficient to take the case to the jury.

In *Lashley v. Koerber,* 26 Cal.2d 83, 156 P.2d 441 (1945), the plaintiff's husband stated that the doctor told him "that he should have" had an x-ray taken "in the beginning," and that the doctor stated that the fault was his. The court held as follows:

> "In the present case we are satisfied that *a jury,* considering the background

of all the other evidence, *could reasonably conclude that the admissions of defendant physician imported that he had not exercised that reasonable degree of skill and learning and care ordinarily exercised by other doctors of good standing* practicing in the community and that as a proximate result of such negligence plaintiff suffered damage. To phrase it differently, in the light of the seeming conflicts in defendant's testimony and all the other circumstances of the case, his admissions that he 'should' have had an X-ray taken 'in the beginning' and that he was at 'fault' in that regard constitute evidence of a character competent to require that the issue of defendant's negligence be decided as one of fact rather than of law." *Id.* at ——, 156 P.2d at 445–46 (emphasis added).

The court in *Scott v. Sciaroni,* 66 Cal.App. 577, 226 P. 827 (1924), held as follows:

> "The testimony as to defendant's admission that he 'left the radium on too long' and that 'it was his fault that she was in the condition she was in,' when considered in connection with proof of the long-continued intense pain suffered and the failure of the burned part to heal, constitutes sufficient expert evidence to require the submission of the case to the jury. If the defendant had admitted that the injury complained of was caused by his negligence, it would hardly be contended that the evidence was insufficient to go to the jury. In the sense in which the word 'fault' was used in the foregoing admissions, it is synonymous with 'negligence.'" *Id.* at ——, 226 P. at 829.

As a final example, the court in *Bungardt v. Younger,* 112 Okl. 165, 239 P. 469 (1925), held as follows:

> "At the time the demurrer to plaintiff's evidence was interposed, in addition to the evidence heretofore extracted, plaintiff had proven by several witnesses as a part of his case in chief certain declarations against interest claimed to have

been made by defendant between the time of the first setting of the tibia and the time of the Lane plate operation. These declarations against interest tended to show that the fracture of the fibula was not discovered by defendant until some three weeks after setting the tibia, that he expressed surprise at finding the fibula fractured, and stated in substance that if he had discovered and treated that fracture in the first instance along with the tibia the leg would have required no further operation and recovery would have been complete. These declarations, if made, were made by an expert assuming to treat plaintiff with ordinary skill and care, and tended to prove a want of ordinary skill and care in such treatment. This was competent evidence for the purpose offered, and, together with all of the other facts and circumstances in evidence, including the testimony of Dr. Freeman, [that another operation will have to be performed if the boy is to have a good leg] made such a case as entitled plaintiff to go to the jury." *Id.* at ——, 239 P. at 471–72.

The present case cannot be distinguished from the foregoing. The Maxwells have alleged that Stromberg stated that he "messed up" or "made a mistake." As stated in *Wickoff v. James, supra,* all of the definitions of "to make a mess of" "indicate that one of the meanings of the phrase is bungle or botch, which in turn connotes a job done in an unskillful manner." 159 Cal.App.2d 664, 324 P.2d at 664. Here it cannot be said as a matter of law that a jury could not reasonably infer from Stromberg's alleged statement an admission that he had not met the applicable standard of health care practice in the community. The existence of this factual question precludes the entry of summary judgment. It is important to keep in mind that it is not our function to presuppose that a plaintiff's case may not persuade a jury. Nor is the trial court to do so. All that is at stake is whether the plaintiff, as a matter of law, is precluded from placing her case before a jury. The case law here is squarely against the granting of defendant's motion.

McFADDEN, J., concurs.