Argued December 4, affirmed December 24, 1958

# CASCADE LUMBER TERMINAL, INC. *v.* CVITANOVICH

332 P. 2d 1061

*Philip A. Levin,* Portland, argued the cause for appellant. On the brief were Thompson & Sahlstrom, Eugene.

*Mark C. McClanahan,* Portland, argued the cause for respondent. With him on the brief were King, Miller, Anderson, Nash & Yerke, Portland.

Before PERRY, Chief Justice, and ROSSMAN, McALLISTER and O'CONNELL, Justices.

ROSSMAN, J.

This is an appeal by the defendant from a judgment which the circuit court entered after it had directed a verdict which awarded the plaintiff $1,100 on its first cause of action, $760.14 on its second, and $300 as an attorney fee. The complaint sets forth separately two causes of action. The first was upon a promissory note in the amount of $1,100, signed by the defendant August 24, 1953, and payable in 30 days to the plaintiff. The complaint alleged nonpayment after demand. The second cause of action alleged that between August 18, 1953, and February 26, 1954, plaintiff "loaned and advanced to defendant," at the latter's request, $2,925 "which defendant promised and agreed to repay by the delivery of logs to plaintiff."

It was then alleged that only $2,164.86 of the advances had been repaid, leaving a balance unpaid of $760.14.

The answer admitted plaintiff's corporate character, but denied all other averments. Affirmatively, the answer alleged that July 10, 1953, plaintiff and defendant executed an agreement, a copy of which was made a part of the answer. We interrupt the recitals of the answer to take note that the agreement, succinctly stated, required (1) the defendant to log a tract of land described in the agreement and, upon close of the operations, to purchase the logged-off land at the price of $15,000; (2) the plaintiff to pay the defendant for logs delivered $18.50 per thousand feet in this way: $11.00 per thousand feet in cash and $7.50 per thousand feet through application of that amount upon the purchase price of the land [which was owned by the plaintiff]. In addition to the covenants just mentioned, the written instrument contained others of an ancillary nature. We shall omit mention of most of those subsidiary features, with the exception of the following: (a) time was made of the essence, and (b) the instrument required the defendant to deliver to the plaintiff, prior to October 1, 1953, one million feet of logs from the tract. We now return to the answer. We have seen that the agreement of July 10, 1953, bound the defendant to purchase from the plaintiff the tract after it had been logged. The answer alleged:

" * * * That on or about September 17, 1954, Plaintiff made demand upon the Defendant for cash payment of the balance of the purchase price for the real property described in the agreement and Defendant was unable to comply with the request of the Plaintiff. That thereafter negotiations followed. That the Plaintiff and the Defendant's attorney, John E. Jaqua, delivered to the Plaintiff

a quit claim deed, a copy of which is attached hereto, made a part hereof and referred to as Exhibit 'B,' together with his letter of November 2, 1954, with instructions therein, a copy of which is attached hereto, made a part hereof and referred to as Exhibit 'C.' That Plaintiff executed a release on October 5, 1954, a copy of which is attached hereto, made a part hereof and referred to as Exhibit 'D.' That it was the clear understanding of the Plaintiff and Defendant that the delivery of quit claim deed to the Plaintiff was to be in full discharge of all claims that Plaintiff might have against the Defendant."

The copy of the release which was attached to the answer and made a part thereof shows that the instrument spoke as follows:

"KNOW ALL MEN BY THESE PRESENTS That Cascade Lumber Terminal, Inc., an Oregon corporation, for a good and valuable consideration, the receipt of which is hereby acknowledged, does by these presents release and forever discharge R. T. Cvitanovich and Donnagene Cvitanovich, husband and wife, and each of them, of and from any and all claims or demands which said Seller has or might have against said Buyer and his wife, or either of them, for or on account of the balance due in the sum of $13,548.15 under the terms of that certain agreement dated July 10, 1953, between Buyer and Seller."

The evidence disclosed that the plaintiff owned the tract of land which we have mentioned and that the defendant was a logger. Although the agreement of July 10, 1953, bound the defendant to deliver to the plaintiff one million feet of logs taken from the land prior to October, 1953, only 193,580 feet had been delivered by March 12, 1954. August 24, 1953, the plaintiff advanced to the defendant $1,100 and at that time the defendant signed the promissory note upon which

the first cause of action is based. It was in default November 30, 1954, when the complaint in this case was filed. The second cause of action was based upon advances made by the plaintiff to the defendant between August 18, 1953, and February 26, 1954, totaling $2,925. We have mentioned the fact that by March 12, 1954, when the defendant made his last delivery of logs to the plaintiff, only 193,580 feet of logs had been delivered. Since the agreement of July 10, 1953, required the plaintiff to withhold $7.50 per thousand feet from the sums payable to the defendant for logs delivered and apply the withheld amounts upon the purchase price of $15,000 which defendant undertook to pay for the land, the plaintiff had withheld $1,451.85 by March 12, 1954. Thus, there remained unpaid on the purchase price $13,548.15.

Following the defendant's failure to comply with the terms of the contract of July 10, 1953, some negotiations took place between the parties which sought at the outset to find a means whereby the defendant could complete his purchase of the land. When this terminated in failure, the defendant engaged as his attorney Mr. John E. Jaqua, of Eugene, and thereupon some discussion took place between Mr. Jaqua and plaintiff's counsel. Presently, in harmony with an understanding which was effected, the defendant and his wife, on October 23, 1954, executed the quitclaim deed which has been mentioned, and October 25, 1954, the plaintiff signed the release from which we quoted. Plaintiff's counsel mailed the release to Mr. Jaqua with a letter, which stated:

"Pursuant to Mr. Wiener's conversation with you on October 23, 1954, we enclose duly executed release of Cascade Lumber Terminal, Inc., releasing R. T. Cvitanovich from any obligation he might have to pay the sum of $13,548.15 due under the

terms of that certain agreement dated July 10, 1953, between him and Cascade Lumber Terminal, Inc.

"You are authorized to deliver said release, together with the check for $150 which was delivered to you on October 23, 1954, upon obtaining and forwarding to this office a quitclaim deed from R. T. Cvitanovich and his wife relating to the property described in the aforesaid agreement."

In the meantime, Mr. Jaqua mailed to plaintiff's counsel the quitclaim deed. In the discussions and negotiations which preceded the execution and delivery of those two instruments no mention was made of the note in the sum of $1,100 or of the other advances. In fact, the defendant had not disclosed to Mr. Jaqua that he had signed a note and borrowed the sums of money. The negotiations were concerned only with the defendant's interest, if any, in the tract of land and the balance of $13,548.15 of its purchase price which remained unpaid.

The foregoing is a partial statement only of the facts revealed by the evidence.

The defendant submits five assignments of error, as follows:

1. "The trial court erred in denying the motion of the Defendant R. T. Cvitanovich for judgment on the pleadings."

2. "The trial court erred in receiving in evidence over the objection of the Defendant, Plaintiff's Exhibit B."

3. "The court erred in overruling the Defendant's motion for nonsuit."

4. "The court erred in directing a verdict for the Plaintiff and against the Defendant."

5. "The second count of the complaint fails to state a cause of action."

We add that no demurrer tested the sufficiency of the pleading. The first four assignments of error

are succeeded in each instance by the motion made during the trial.

■ Exhibit B, which is mentioned in the second assignment of error, is a sheet of paper, a little larger than a postal card, which was taken from the plaintiff's loose-leaf subsidiary ledger. There was entered upon it the plaintiff's charges against the defendant and the credits to which he was entitled. The charges against him were taken from the plaintiff's check register in which the plaintiff regularly entered all checks which it issued. The credits were taken from the log scalers' sheets. All of the checks which formed a part of the charges were offered in evidence. All except three became exhibits. In those three the payee was not the defendant and, therefore, the defendant's objections to them were sustained.

When the document which became marked Exhibit B was offered in evidence, defendant's counsel made an objection. The essence of which is the following:

> " * * * on the basis first of all the best evidence rule, and secondly, on the basis of the shop book rule, this not being the original document of original entry."

Mr. Knute Soleim, who was the plaintiff's bookkeeper when Exhibit B was prepared, testified that it came from and was a part of "the book I used to keep track of the various log advances to the different loggers." He said that he was the one who prepared the document, and termed it "the subsidiary ledger for that account." He made the entries in the regular course of business, so he swore, and at the time when the events occurred.

According to our understanding of the evidence, Exhibit B is the first of the records kept by the plaintiff which show the status of the account between

plaintiff and defendant. As we have said, the debit items were taken from the check register, and the credit items from the scale sheets. Three of the columns of Exhibit B bore, respectively, these headings: Debit, Credit, Balance. By consulting the column headed Balance, one could readily determine the state of the account on any selected day. Had the plaintiff depended upon its check register to establish its advances to the defendant, it would have produced a record containing 1600 disbursements, only nine of which pertained to the defendant. The checks signed by the plaintiff and cashed by the defendant were the best evidence of the advances, and Exhibit B was the bookkeeping record which showed the state of the account.

It is our belief that Exhibit B was admissible in evidence under ORS 41.690, which reads:

"A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and, if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

It will be observed that the section of our laws just quoted does not include the words "original entry" which form a part of the defendant's above-quoted objection and which he employs repeatedly in his claim of error. ORS 41.690 is a part of the Uniform Business Records As Evidence Act. See 9A ULA p 299. In 1929 the legislature adopted Oregon Laws 1929, ch 400, which included the words "original entries." The 1929 enactment was repealed by Oregon Laws 1935, ch 323, which was the Model Act sponsored by the

Commonwealth Fund. See The Law of Evidence, p 63. That act was, in turn, supplanted by ORS 41.690.

■ It will be noticed that the Uniform Act, that is ORS 41.690, contemplates that the trial judge shall exercise discretion in determining the admissibility of "a record of an act, condition or event." The proponent of the record must, of course, show that the document is actually a record of an act, condition or event. Next, the record must be relevant. The custodian of the record "or other qualified witness" must testify to its identity and the mode of its preparation. He must likewise show that "it was made in the regular course of business at or near the time of the act, condition or event." When those matters have been shown, as they were in the case at bar, the admissibility of the record becomes a matter for the exercise of the trial judge's sound discretion, for the act says: "if in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." If the trial judge resolves his discretion favorably to the proffered document, it is admissible. See *Douglas Creditors Assn. v. Padelford,* 181 Or 345, 182 P2d 390, in which this court, in commenting upon the discretion just mentioned, held that, upon appeal, the trial judge's exercise of discretion "should not be disturbed except in case of manifest abuse of discretion." In the present instance, the record fails to indicate any abuse of discretion. Assignment of error No. 2 is without merit.

We have given careful attention to all of the other assignments of error. The first and fifth involve nothing other than a consideration of well established rules of pleading. We do not believe that they submit anything calling for another statement in this opinion

of those rules of pleading. The other assignments of error are dependent upon a review of the evidence. We have given the transcript and the briefs careful attention and that analysis has brought us to the view that the rulings challenged by those assignments of error are without merit.

The challenged judgment is affirmed.