BAKEWELL, Respondent, v. KAHLE, Appellant.

No. 8996.

Submitted April 18, 1951. Decided June 1, 1951.

232 Pac. (2d) 127.

Messrs. Rockwood & Sykes, Kalispell, for appellant.

Mr. Grant Bakewell, Mr. Moncure Cockrell, Kalispell, Mr. T. W. Greer, Whitefish, for respondent.

Mr. F. W. Wilson, Missoula, amicus curiae.

Mr. Forrest C. Rockwood, Mr. Bakewell, Mr. Greer and Mr. Wilson argued orally.

MR. JUSTICE FREEBOURN:

Virginia Bakewell, plaintiff and respondent, brought this malpractice action against Robert R. Kahle, defendant and appellant, for damages, which she alleges she sustained as a patient of and at the hands of defendant, a licensed and practicing chiropractor.

From a jury verdict and judgment in favor of plaintiff in the amount of $5,000, defendant appeals.

Defendant gave plaintiff three treatments or adjustments of vertebrae in her neck, on April 4, 6, and 8, 1949, respectively. Prior to the first adjustment defendant took an x-ray picture of plaintiff's neck. He said such picture showed two vertebrae out of place, accounting for a stiff neck, headaches and sore spot behind the right ear, of which plaintiff complained. These adjustments were given to return such vertebrae to their proper position in the spine.

The complaint, among other things, alleged: That defendant wrongfully diagnosed and treated plaintiff for a misplaced vertebrae when she suffered a tumor or lesion of the brain; and ''the defendant was also negligent, careless and unskillful by giving the plaintiff a second and much harder thump on the 8th day of April, 1949, against plaintiff's will after he was told by her to stop, that she was sick and could not take any more.''

Plaintiff's testimony shows: ''A. Well, he explained the x-ray showed there were two vertebrae misplaced, and explained to me that could cause the condition which existed at that time in my head and neck, and I asked him what he would recommend as a cure, and he said adjustments would have to be made. I asked him if that would take long or be severe. He said, 'No, they aren't hard. This vertebra has probably been out of place for years, and it will take a while to get it back into place.' ''

As to what occurred during the April 8th adjustment she said:

''A. I was on the table long enough to get adjusted in the proper place. As soon as I was in the right position the thump came immediately, right away, by Dr. Kahle, on the sore spot on the back of the neck. * * *

''A. I said, 'Oh, that was awful.' I said, 'Something terrible has happened to me.' I said, 'That was awful. Let me up. I don't want any more; I can't stand anymore.' He said, 'You will be all right. Let me get this other one.' * * *

''A. I said, 'I have had enough—don't—stop.' * * *

"Q. Did you consent or withdraw your orders? A. No, my last words were 'I can't take any more—stop.'

"Q. After you told him that he went ahead and gave you the further adjustment without your consent? A. Yes, also the motion up and down the spine."

Plaintiff, 49 years of age, said that when she came to defendant for treatment she was able to walk, had good eyesight, carried on normal activities, was strong and able-bodied, and suffered only from a stiff neck, headaches and a sore spot behind the right ear.

Immediately after the last adjustment, plaintiff was unable to walk, her vision was impaired, she vomited and was in pain, and suffered a partial paralysis of the throat and vocal chords.

Taken from defendant's office, to a Kalispell hospital, on a stretcher, she was, later removed to the Mayo Clinic at Rochester, Minnesota, for examination and treatment.

At the time of trial, in November, 1949, her eye sight was still impaired; she had only partial use of the right hand and leg; had no feeling in her right finger tips, with loss of grip in the right hand. She walked slowly and with a limp. She was worried and discouraged and had paid out $2,000 for necessary hospital, medical care and attention.

One of her medical witnesses testified that her present condition would grow "possibly progressively worse."

The legislature has made "chiropractic" a distinct system, method and practice of securing health and treating disease. The word is coined from two Greek words "chiro" and "practicas," signifying something done with the hands. R. C. M. 1947, section 66-507, provides:

"Chiropractic is the science that teaches that disease results from anatomic disrelation, and teaches the art of restoring anatomic relation by a process of adjusting by the use of the hand.

"No other means of securing health shall be construed to be chiropractic except the application of the inherent qualities at the time in the patient or appertaining to the chiropractor."

It is "a system, or the practice, of adjusting the joints, esp.

of the spine, by hand for the curing of disease.'' A chiropractor is ''a practitioner of this system.'' Merriam's Webster's New International Dictionary, sec. ed.

As a general rule, malpractice suits are based on negligence, and do not differ in their essential ingredients from any other action for damages arising from negligence. 70 C. J. S., Physicians & Surgeons, sec. 48, p. 955.

No good reason exists why, in such cases, the law, as applies to physicians, surgeons, dentists and the like, should not apply to chiropractors..

It is one of the fundamental duties of a physician to make a properly skillful and careful diagnosis of the ailment of a patient, and if he fails to bring to that diagnosis the proper degree of skill or care, and makes an incorrect diagnosis, he may be held liable to the patient for the damage thus caused just as readily as he must answer for the application of improper treatment. 41 Am. Jur., Physicians and Surgeons, section, 92, p. 209. See 70 C. J. S., Physicians and Surgeons, sec. 48, pp. 960, 961.

''While an unauthorized operation is, in contemplation of law, an assault and battery, it also amounts to malpractice even though negligence is not charged. Herzog, Medical Jurisprudence, 153, sec. 180, defines malpractice as follows: 'Malpractice, also sometimes called ''malapraxis,'' means bad or unskillful practice, resulting in injury to the patient, and comprises all acts and omissions of a physician or surgeon as such to a patient as such, which may make the physician or surgeon either civilly or criminally liable.' '' Physicians' and Dentists' Business Bureau v. Dray, 8 Wash. (2d) 38, 111 Pac. (2d) 568, 569. See 70 C. J. S., Physicians and Surgeons, sec. 40, p. 945, and 41 Am. Jur., Physicians and Surgeons, secs. 107, 108, pp. 220, 221.

Physicians and surgeons, called by plaintiff, competent to read x-ray pictures of the spine, after examining the x-ray picture of plaintiff's neck taken by defendant, stated such x-ray picture showed no vertebrae out of place.

They also testified that other x-ray pictures of plaintiff's neck taken on April 8th, after she had reached the hospital, showed no vertebrae out of place.

The testimony of medical witnesses and evidence from the Mayo Clinic indicated plaintiff was suffering from a brain tumor when she visited defendant's office.

From the evidence before them, the jury could find: That defendant made a wrong diagnosis or analysis of plaintiff's condition, and that her stiff neck, headaches and sore spot behind the right ear were not due to vertebrae out of place; that there were no vertebrae out of place and the x-ray picture, taken by defendant, so showed; and that defendant should have given plaintiff no adjustment.

The jury could also find: That during the April 8th adjustment, after plaintiff directed defendant to stop, defendant continued adjustment and manipulation with his hands and caused a rupture of a brain tumor, resulting in injury to plaintiff.

One of plaintiff's witnesses, a physician and surgeon, testified, ''It was the trauma produced there was the cause,'' of plaintiff's serious condition existing immediately after the April 8th adjustment.

Plaintiff made a case for the jury. Kuechler v. Volgmann, 180 Wis. 238, 192 N. W. 1015, 31 A. L. R. 826.

The verdict was not excessive.

We have examined all errors assigned by appellant and find none which affect the substantial rights of the parties.

For the reasons stated the judgment of the lower court is affirmed.

MR. CHIEF JUSTICE ADAIR and ASSOCIATE JUSTICES METCALF, BOTTOMLY and ANGSTMAN concur.