Argued June 3, 1964, reversed and remanded March 17,
petition for rehearing denied April 13, 1965

# MAYOR *v.* DOWSETT
### 400 P. 2d 234

*James H. Clarke,* Portland, argued the cause for appellant. With him on the briefs were Koerner, Young, McColloch & Dezendorf, James C. Dezendorf, and George L. Wagner.

*Cleveland C. Cory,* Portland, argued the cause for respondent. With him on the brief were Rockwood, Davies, Biggs, Strayer & Stoel, Hugh L. Biggs and Robert L. Ridgley.

Before ROSSMAN,[*] Presiding Justice, and PERRY, SLOAN, O'CONNELL, GOODWIN, DENECKE and LUSK, Justices.

---

[*] Retired January 4, 1965.

LUSK, J.

This is an appeal from a judgment for the defendant based on the verdict of a jury in a medical malpractice action.

The defendant, Dr. J. W. Dowsett, is a duly licensed physician and surgeon who maintains an office in Portland, Oregon, and specializes in obstetrics. He attended the plaintiff, Arloine Mayor, a married woman, during her pregnancy and at the birth of her second child. Under his direction, Dr. L. M. Sutherland administered a spinal anesthetic shortly before the birth of the child. Following the birth plaintiff became paralyzed from the neck down and has so remained. The evidence indicates that this condition is permanent.

The plaintiff alleged in her complaint that her paralysis was caused by the negligence of the defendant in improperly positioning, handling, placing and securing plaintiff, thereby causing and permitting the spinal anesthetic solution injected in plaintiff's spine to contact, shock and destroy the motor nerves in plaintiff's spine. There were other charges of negligence, but this was the only one submitted to the jury by the trial judge.

The defendant moved for a directed verdict on the ground of insufficiency of the evidence of negligence or proximate cause. The motion was denied and the defendant urges in this Court that it should have been allowed. We will consider this question first.

Defendant does not now contend that there is no evidence of negligence. His claim is that there is no evidence that the alleged negligence was the cause of plaintiff's injury.

The plaintiff was 34 years of age in 1959. She was employed in the office of a contracting firm and also

was a vocalist and derived an income from her singing. There is substantial evidence that she was in good health during her pregnancy and at the time of the birth of her child. She had no illness during this period except that for a week in September, 1959, she suffered from a cold which, however, caused her no loss of time from her job, but made it necessary for her to cancel several singing engagements. Dr. Dowsett prescribed for her cold fluids, aspirin and cough medicine. He testified that she surmounted that complaint. The last time that Dr. Dowsett saw the plaintiff before she went to the hospital was on November 2, 1959. He testified that at that time her condition was "real good." During delivery, Dr. Dowsett testified, "[h]er condition was excellent. She complained of nothing at all. She was real happy, * * *." There is contradictory evidence as to plaintiff's general condition of health, but for present purposes it need not be considered.

Plaintiff was admitted to Emanuel Hospital in Portland on the evening of November 6, 1959. The following morning shortly before six o'clock she was taken to the delivery room. The defendant arrived at the hospital about seven o'clock, a.m., and attended her until the baby was born. At 9:48 a.m. Dr. L. M. Sutherland, a resident physician at the hospital, administered a saddle block spinal anesthetic at the direction of the defendant. The injection was in the lower part of the spine between the fourth and fifth lumbar vertebrae. The anesthetic, as described in a hypothetical question addressed to a medical witness for the plaintiff, was "a two and a half per cent Novocain, being ten per cent Novocain or Procaine in saline solution that was diluted by * * * spinal fluid from the patient herself, * * * making it one part of

anesthetic solution and three parts of spinal fluid, a total of two cubic centimeters being injected into the * * * spinal canal * * *." It is not disputed that the injection was made at a proper place and all the evidence shows that the solution used was a mild one. At 9:52 a.m. the plaintiff gave birth to a normal baby boy.

The hospital record shows that at 11:20 a.m. on November 7 the plaintiff complained of intermittent chilling, and Dr. Dowsett was notified; that at 11:45 a.m. after the plaintiff was removed to her private room, she complained of shortness of breath; and at 12:30 p.m. the following entry made by the nurse appears: "BP 104/80. Pt rigid and movement of arms spastic—nauseated." Again at 8 p.m. on November 7 the notation "Shortness of breath" appears, and at 9 p.m.: "Patient seems to have difficulty breathing."

Dr. Dowsett left the hospital at noon on November 7. At 7:15 on the morning of November 8 he received a message that the plaintiff had a convulsion and was totally unconscious. He returned immediately to the hospital. Dr. Sutherland, Dr. Bruce Kvernland, a neurological surgeon, and Dr. D. W. Clouser, an anesthesiologist, were also summoned. The hospital record shows that at 7 a.m. on November 8th the plaintiff was breathing with grunts, and at 8:30 respiration ceased. She was limp all over her body. Her neck and face and extremities were flaccid. Dr. Sutherland testified that the patient was unconscious, that she "was cyanosed and she was moving her extremities in a restless way, but she obviously was not responding to knowing what she was doing." A tracheotomy was done by Dr. Kvernland, and a tracheotomy tube was inserted and connected with a Bird respirator, a device

that breathes automatically for the patient by the use of oxygen and carbon dioxide. By this means respiration was restored and maintained.

Dr. Kvernland made a working diagnosis of myasthenia gravis, a disease characterized by paralysis of the muscles, and to test this assumption, administered a drug called Prostigmin, following which the plaintiff was able to wiggle her fingers and toes. He also found that by tickling the bottom of her feet and pricking her feet and hands with a needle, she had feeling.

On November 27, 1959, the plaintiff was removed to the University of Oregon Medical School Hospital, where she remained until May 10, 1961. While there has been some improvement in her condition, at the time of the trial, in June, 1963, she was still partially paralyzed from the neck down, and could breathe only with artificial aid—the Bird respirator by day, and a mechanical rocking bed at night.

The plaintiff testified:

"Q Did anything unusual happen during the course of their attempting to deliver the baby?

"A They were having a hard time with the baby and he kept saying I was going to have to work harder. And it seemed like two nurses came on in each side and held my arms, and helped me struggle, and then two doctors, and it seemed like I was being pulled apart like a chicken, and got my legs up quite high and got my neck down until it got pretty hard to breathe. And they got my feet here and my arms up here and my neck was being pinched.

"Q Did your chin come in contact with your chest?

"A Yes.

"Q Did that interfere with your breathing?

"A Yes, it did. And I thought it would be over in a minute. And I kept struggling and everything went.

"Q Can you describe a little bit more for us what you meant or what sensation you had when you say, everything went?

"A At first I was helping, you know, working as hard as I could and he kept telling me to push down on all the muscles that I could, and, I think, I was doing a good job helping. And all of a sudden I felt there was no push left and everything collapsed.

"Q Could you move your arms and legs?

"A They were holding me with my arms and legs and I don't know at that time if I could have worked them myself or not.

"Q Were you conscious when the baby was born?

"A Yes, and when he cried.

"Q Do you know whether you lost consciousness at any time?

"A No, I really don't know.

"Q What happened when the baby was born?

"A They moved me back to the cart they brought me down on.

"Q Was that done immediately?

"A As soon as they kind of cleaned me up and put me over there.

"Q How long did you stay on the cart in the delivery room?

"A I think it was approximately a half hour. It could have been more or less.

"Q Do you remember going back down to the room?

"A Yes, I remember going to the room.

"Q Do you remember being put in the bed?

"A I remember being put in the bed and they came soon after for lunch.

"Q What happened when lunch came?

"A I really don't know, I was so tired. But the potatoes and gravy looked so good and I tried to reach up for it and I couldn't And I thought I was just so tired.

"Q How long was that after you came down from the delivery room?

"A About a half hour.

"Q Soon after?

"A Yes, I don't think I had been in my room but a few minutes when they came with the lunch.

"Q After you noticed you couldn't move your arms, thereafter could you move?

"A No, I couldn't move.

"Q Was anything else other than your arms involved?

"A I didn't try to move anything else and I was so tired, and I tried to keep flat because of the spinal. And from then on everything went hazy."

As to the question of impairment of sensory perception, the plaintiff testified:

"A I was completely numb for the first four months. The doctors would come in and stick pins in my feet and go up my leg and I couldn't feel them, and after about four months, about the time I started to be able to move, then I began to feel the pin pricking at the bottom of my feet. And then it was about a month later that I began to feel them in my legs, but then, it was about two or three months later that I felt them in my arms. But it wasn't until the tenth month that I could feel in my fingertips. My husband would bring the baby and put him by my bed and I couldn't feel him up until ten months.

"Q Did the feeling and the muscle movement come back about the same time and about the same degree?

"A It started about the same time, yes."

We go to the expert testimony.

There is evidence that it is the standard practice in Portland to place a pillow under the patient's head when administering a spinal anesthetic in order to elevate the head and guard against the danger of the anesthetic ascending the spinal canal and attacking the phrenic nerve which controls the diaphragm and the nerves in the cranial area. The plaintiff testified that no pillow was used in her case. The testimony of the defendant and Dr. Sutherland is to the contrary, but, of course, this issue was for the jury.

There is evidence that one would not expect permanent partial paralysis from the neck down to result from the delivery of a child following a spinal anesthetic when due care and proper practice are observed. The defendant so testified, and further, that he was familiar with errors in technique or traumatic introduction of the spinal anesthetic that can cause paralysis. The percentage of such cases is very small. One study showed that of 482 patients who had had neurological complaints following spinal anesthesia, in the case of four paralysis was caused by the anesthesia.

Dr. Charles C. Carter, a witness for the defendant, testified that he had seen eight to twelve cases of permanent partial paralysis resulting from a spinal anesthetic. Dr. Carter is a neurologist, and assistant professor in neurology at the University of Oregon Medical School. He had supervision of the plaintiff's case while she was in the Medical School Hospital.

Besides the defendant, Dr. Sutherland, and Dr. Carter, the medical witnesses on behalf of the defend-

ant were Dr. Kvernland and Dr. Clouser. All these witnesses gave it as their opinion that the plaintiff's paralysis was not caused by the anesthetic.

One of the reasons for this opinion was that the plaintiff suffered no impairment of the sensory nerves, but only of the motor nerves. The motor nerves and the sensory nerves emerge at the same level from the spinal cord and come together and fuse. The plaintiff's phrenic nerve, in the neck area, which supplies the diaphragm, an important muscle in regard to respiration, was damaged, as were the cranial nerves. Had the damage to these motor nerves been caused by the anesthetic the sensory nerves would necessarily have been affected; but, as previously stated, Dr. Kvernland testified to plaintiff's retention of sensory function demonstrated by pricking her extremities with a needle, and similar testimony was given by the defendant and by Dr. Carter.

Another reason, according to the defendant's expert witnesses, for ruling out the anesthetic as the cause of plaintiff's paralysis was that during the process of delivery the plaintiff's blood pressure remained normal. Had the anesthetic ascended to the cranial nerves, it would have affected the sympathetic nerves which control blood pressure, and, as Dr. Clouser testified, "if many of these nerves are knocked out by spinal anesthetic, the blood pressure tends to drop." Dr. Clouser concluded that, since the blood pressure did not drop "this spinal stayed down in the saddle block area where it is supposed to." Dr. Dowsett testified:

> "Well, if it had been an immediate reaction to the anesthesia, the patient would have gone into profound collapse, and I mean real collapse. The blood pressure would completely disappear, her

breathing would have stopped, she would have been cyanotic and real extreme emergency procedures would have had to be carried out to save her life immediately at the time the spinal was given. If it had been a delayed reaction or a reaction from the anesthetic agent, her paralysis for the anesthesia would not recover, [sic] she would continue to be paralyzed from the time the administration of her spinal block."

As above noted, however, within less than three hours after the plaintiff's child was born, her blood pressure dropped to 104/80.

Other reasons for ruling out the spinal anesthetic as the causative agent were that tests of the plaintiff's spinal fluid made at Emanuel Hospital 22 hours after delivery disclosed only a slight increase of protein count to 62 milligrams per cent and no white blood cells. Dr. Carter testified that "in a majority of cases" if something is wrong with the nerves that come out of the spinal cord it is reflected in abnormality in the spinal fluid, particularly in elevation of the protein count, and that the increase shown was without significance. Dr. Dowsett's testimony is to the same effect. He said that white blood cells "reveal an irritating agent" within the spinal canal.

Finding nothing abnormal in the spinal fluid, and since "[t]he motor malfunction, the weakness was way out of proportion to any impairment of sensation that we could find," Dr. Carter directed his "interest away from the anatomy adjacent to the spinal cord in the spinal canal to other anatomy." He made a muscle test which indicated that there was impairment of nerve supply to the muscle and that the nerves were not functioning well due to some disease process. The place of impairment was "in the nerve out."

"Q So that the trouble was as the nerve got

closer out of the extremities and not closer to the spinal column, is that so?

"A That was our contention."

Dr. Carter called the plaintiff's affliction "infectious polyneuropathy mainly because this is a specific disease entity which doctors recognize as an illness like polio or like appendicitis or like pneumonia and so forth." "Neuropathy" means "there is something pathologically wrong with that nerve." He also termed the illness "infectious polyneuritis" indicating "an inflammation of the nerve." This, he said, is a "little more specific term" than neuropathy. The cause of the disease is "undetermined." The final diagnosis as shown by the hospital record was "Multiple Neuropathy, Chronic, Cause Undetermined."

On cross-examination Dr. Carter testified:

"Q Now, Doctor, I take it that you relied strongly, as I understood your testimony, in making your final diagnosis, on the fact that you said that Mrs. Mayor's sensory feeling didn't ever disappear, is that correct?

"A This is one of the important points, yes.

"Q What difference, in your diagnosis, would there be, if any, if the loss of sensory function and the loss of motor function was paralyzed?

"A Then, of course, I would have to re-evaluate the area of the body involved and I would have to re-evaluate the causes for such involvement.

"Q And that would point back again to the spinal fluid, wouldn't it?

"A Probably would."

The sole medical witness for the plaintiff was Dr. Smith, a general practitioner in Portland. Dr. Smith took care of the plaintiff after she returned home from the University of Oregon Medical School Hospital. He had had experience in administering spinal

anesthetics. He claimed no expertness in the field of neurology, but based his testimony on his experience, the history of the case and a study of the relevant medical literature. He testified that in his opinion Mrs. Mayor's paralysis was either directly or indirectly related to the administration of the spinal anesthetic, that "the sequence of events between the administration of the anesthetic and the development of the paralysis is too close and too significant to be ignored."

On cross-examination Dr. Smith conceded that if the anesthetic reached the upper levels of the spinal canal he would expect an immediate fall in blood pressure, embarrassment in the patient's breathing and cyanosis, that she would have a cardiac arrest "sooner or later," and that if the spinal fluid showed no white blood cells and no elevation of protein within 24 or 36 hours after the anesthetic had been given, he would consider that there was no serious effect from the spinal. Later, he testified that he would not know how to interpret the absence of white blood cells, and that a "virus could have caused this condition, certainly that is the basis for the whole diagnosis as it is of an infectious polyneuritis, supposedly caused by a virus." He said that it was "basically true" that the plaintiff had involvement of the motor nerves, but not the sensory nerves, that he did not know whether this indicated that the damaging agent was not an intradural agent, but that if a neurologist would say that this was the diagnostic test he would not dispute it. Nevertheless, he stated that from "the story * * * I have heard," the anesthetic rising up the spinal canal could very likely be the explanation of the case. He added that from his study of the literature he had found "that typical quadriplegia, the paralysis that

can develop, has developed and has been reported following spinal anesthetic, and the symptoms sometimes come on after the anesthesia has worn off, and that it takes very small concentrations of anesthetic to produce symptoms." He read from a report: "The incidence of severe neurological complications from spinal anesthesia in San Diego County in a series of 32,828 cases in a five-year period was 0.012 per cent." He further testified that his experience in spinal anesthesia has been that the anesthetic wears off within from one to three to four hours.

■ The proof of causation in a medical malpractice case need not always be direct and positive; it may be circumstantial: *Olson v. McAtee*, 181 Or 503, 517, 182 P2d 979; *Clemens v. Smith*, 170 Or 400, 407, 134 P2d 424; *Carter v. Howard*, 160 Or 507, 512, 86 P2d 451; *Lippold v. Kidd*, 126 Or 160, 174, 269 P 210, 59 ALR 875. From the evidence that the defendant was negligent in failing to place a pillow under the plaintiff's head when the anesthetic was administered, in accordance with the standard practice, a legitimate inference might be drawn that this omission was the proximate cause of the injury sustained by the plaintiff, since this precaution is taken to avoid the danger of the anesthetic ascending the spinal canal. See *Champion v. Bennetts*, 37 Cal 2d 815, 821, 236 P2d 155. The anesthetic, if it encountered the nerves emanating from the higher levels of the spinal cord, was capable of inflicting the injury which the plaintiff actually suffered. No other specific cause of the injury was testified to by any witness. Neither myasthenia gravis, Dr. Kvernland's diagnosis, nor infectious polyneuritis, Dr. Carter's diagnosis (but rejected by Dr. Kvernland), nor multiple neuropathy, the final diagnosis at the University of Oregon Medical School

Hospital, indicates a cause, but a result. "Multiple neuropathy" could just as well be used to describe the plaintiff's paralysis resulting from damage to the nerves caused by the anesthetic as by some unidentified cause.

If it were established without contradiction by the medical evidence that all the manifestations of injury to which the witnesses for the defendant testified must concur in every case before a conclusion would be justified that the damage came from within the spinal canal and, further, that some of these manifestations—reduced blood pressure, cyanosis, difficulty in breathing—must have occurred immediately after the introduction of the anesthetic into the spinal canal, defendant's position might be sustainable. See 2 Harper and James, The Law of Torts, 1100-1101, § 19.11. But this is not the state of the record.

Dr. Smith testified that the symptoms sometimes come on after the anesthesia has worn off and that it may be as much as four hours before it wears off. Dr. Dowsett recognized that there might be "a delayed reaction" from the anesthetic agent in which case, he said, "she would continue to be paralyzed from the time [of] the administration of her spinal block." If it were "an immediate reaction to the anesthesia," then the symptoms of reduced blood pressure, difficulty in breathing and cyanosis would appear immediately. The defendant argues that the evidence shows without dispute that the plaintiff recovered the full use of her legs while in the delivery room, but we think that the evidence is susceptible of a different interpretation.

Dr. Carter testified that if there had been loss of sensory function as well as motor function he would

have to re-evaluate the cause and that would probably point to the spinal fluid.

■ In any appraisal of the evidence, of course, the plaintiff's testimony is not to be ignored. She was a competent witness as to whether she had suffered a loss of feeling and she testified that she was "completely numb" for the first four months and that it was after this that she began to recover some muscle movement and at the same time to recover sensory perception.

Her testimony that during delivery "everything collapsed," that she was unable to reach up for the food they brought her when she was returned to her private room from the delivery room, that she could not move her arms thereafter and did not try to move "anything else" because she was "so tired," indicates that the process of paralysis had already set in. She experienced shortness of breath within two hours after the birth of the baby, within three hours a marked drop in blood pressure, and on the early morning of November eighth she had a convulsion, was cyanotic, totally unconscious, and respiration had ceased.

While the evidence discloses that absence of white cells and of elevated protein count indicate that the cause of the injury was not an agent within the spinal canal, yet it cannot be said that the medical testimony shows that this evidence is conclusive. Dr. Carter testified that "in the majority of cases," if something is wrong with the nerves that come out of the spinal cord, it is reflected in the spinal fluid.

■ We are further of the opinion that res·ipsa loquitur applies to this case. The rule as first formulated in *Scott v. London and St. Katherine Docks Co.,* 3 H & C 596, 601, 159 Eng Rep 665, 667, and quoted

with approval in *Gow v. Multnomah Hotel, Inc.*, 191 Or 45, 52, 224 P2d 552, 228 P2d 791, is as follows:

"There must be reasonable evidence of negligence. But where the thing is shown to be under the management of the defendant or his servants, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by the defendants, that the accident arose from want of care."

As generally stated today, the conditions necessary for the application of the principle of res ipsa loquitur are these:

"* * * (1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff. * * *" Prosser, Law of Torts (2d ed) 201-202, § 42.

We have several times said that this doctrine has no place in an action for medical malpractice: *Eckleberry v. Kaiser Foundation et al*, 226 Or 616, 626-627, 359 P2d 1090, 84 ALR2d 1327; *Malila v. Meacham*, 187 Or 330, 354, 211 P2d 747; *Ritter v. Sivils*, 206 Or 410, 413, 293 P2d 211. But these were all cases which arose out of treatment of a patient or surgery for the purpose of effecting a cure, and in which to apply res ipsa loquitur would have impinged upon the established principle that a physician is not, as stated in *Ritter v. Sivils*, supra, "a warrantor of cure, and if a good result does not ensue from his efforts the doctrine of res ipsa loquitur is not available to his erstwhile patient." The courts have properly adopted

this principle as a measure of needed protection to those engaged in the healing arts against unfounded lawsuits (see *Johnston v. Rodis* (DC Dist Col) 151 F Supp 345, reversed on other grounds, 102 App D C 209, 210, 251 F2d 917), and we sanction no departure from it, nor from the rule that "[i]f the issue turns upon some fact beyond the ken of laymen, expert testimony must be produced showing that the practitioner's treatment fell below the standard of the profession and was the proximate cause of the condition for which the plaintiff seeks an award of damages." *Ritter v. Sivils,* supra. But to say that in an action to recover for personal injury based on negligence—which is all that a malpractice action is—a rule of evidence founded in "common sense"[1] can never have application, no matter what the facts may be, simply because it is a physician who is charged with negligence in the discharge of his professional duty, would be highly unreasonable. "Nothing inheres in medical malpractice actions, as such, which would mitigate against the application of that doctrine in a proper case", *Toy v. Ricker,* 53 NJ Super 27, 33, 146 A2d 510. The most obvious illustration of the use of the doctrine in medical malpractice cases is, of course, where a foreign object, such as a sponge or a needle, is left in the patient's interior at the time of surgery. See Prosser, Law of Torts (2d ed) 210, § 42; Louisell and Williams, Trial of Medical Malpractice Cases, 439, note 52; and cases cited in Annotation, 82 ALR2d 1262, at 1315.

As stated by Louisell and Williams, supra: "Common knowledge among laymen, that the event ordinarily would not have happened without negligence,

[1] Prosser, Res Ipsa Loquitur in California, 37 Cal L Rev 183, 184-185.

has been considered sufficient to raise an inference of negligence" in this class of cases. Medical malpractice cases not involving foreign objects left in the body and not elsewhere herein cited, which either recognize or apply res ipsa loquitur, are cited in the margin.[⊗]

■ Whether there is common knowledge among laymen that paralysis of a healthy woman following childbirth where spinal anesthesia is used would not happen without negligence in the administration of the anesthetic need not now be determined. In *Horner v. Northern Pac. etc. Hosp.*, 62 Wash 2d 351, 382 P2d 518, where the plaintiff emerged from abdominal surgery under general anesthesia with a paralyzed right arm, the court held that this was so extraordinary an occurrence within the general observation of mankind as to raise an inference of negligence that requires both an explanation and proof of non-negligence to meet. But in *Siverson v. Weber*, 22 Cal Rptr 337, 57 Cal2d 834, 372 P2d 97, the court, in an opinion by Chief Justice Gibson, held that the mere fact that the injury suffered by a patient following an operation is something that rarely occurs does not in itself prove that the injury was probably caused by the negligence of those in charge of the operation. This, the court said, would be to "place too great a burden upon the medical profession and might result in an undesirable limitation on the use of operations or new procedures involving an inherent risk of injury even when due care is used."

---

⊗ Vonault v. O'Rourke, 97 Mont 92, 33 P2d 535; Frost v. DesMoines Still College of Osteopathy and Surgery, 248 Iowa 294, 79 NW2d 306; Sanders v. Smith, 200 Miss 551, 27 S2d 889; Dawson v. Allen, 191 Ill App 399; Meadows v. Patterson, 21 Tenn App 283, 109 SW2d 417.

■ We are in accord with the latter view, but it does not control in this case, because here, in addition to the rarity of the injury and the fact that there is no problem of negligence in treatment, but of distinct injury to a healthy part of the body not the subject of treatment or surgery,[8] we have expert testimony that such an injury is not to be expected where due care is observed in the administration of the anesthetic. Where such evidence is produced and the other elements of res ipsa loquitur are present, an inference that the injury was caused by the negligence of the doctor may properly be drawn. As stated in *Salgo v. Leland Stanford etc. Bd. Trustees,* 154 Cal App 2d 560, 570, 317 P2d 170:

> "A study of the cases both pro and con on the application of the doctrine in malpractice actions demonstrates that the doctrine is applicable only where it is a matter of common knowledge among laymen *or* medical men or both that the injury would not have occurred without negligence."

See, also, *Seneris v. Haas,* 45 Cal 2d 811, 291 P2d 915, 53 ALR2d 124; *Siverson v. Weber,* supra, 57 Cal 2d at 836; *Wolfsmith v. Marsh,* 51 Cal 2d 832, 835, 337 P2d 70, 82 ALR2d 1257; *Fehrman v. Smirl,* 20 Wis 2d 1, 25, 121 NW2d 255, 122 NW2d 439; Prosser, Law of Torts (2d ed) 202, § 42. In *Kaufman v. Fisher,* 230 Or 626, 639, footnote 10, 371 P2d 948, we recognize that in appropriate cases plaintiff "may strengthen the inference through the use of expert testimony showing that accidents of the kind in question do not commonly

---

[8] Some of the cases consider this a material factor in applying the rule of res ipsa loquitur. See Annotations, 162 ALR 1265 at 1307-1310; 82 ALR2d 1320-1321; Ybarra v. Spangard, 25 Cal 2d 486, 154 P2d 687, 162 ALR 1258; Jensen v. Linner, 260 Minn 22, 108 NW2d 705; Dodson v. Pohle, 73 Ariz 186, 239 P2d 591. Cf. Carter v. Howard, supra.

happen in the absence of negligence by persons in the defendant's position."

*Seneris v. Haas,* supra, is strikingly similar on its facts to the case at bar. The plaintiff, a woman in good health, suffered paralysis of her legs after childbirth incident to which a spinal anesthetic was administered. She awakened the morning after the child was born and complained that "she couldn't move her legs." There was evidence that, contrary to the established practice, the anesthetic was injected above the end of the spinal cord. The court held that from this and other medical evidence an inference could be drawn that the proximate cause of the injury was the damage to the spinal cord inflicted by the anesthetic. The court further held that res ipsa loquitur applied, since it was common knowledge that such an injury does not ordinarily occur in the absence of someone's negligence and there was medical evidence to that effect.

Since this case was submitted, counsel for the defendant have called our attention to *Hale v. Heninger,* 87 Idaho 414, 393 P2d 718, decided July 10, 1964. The plaintiff in that case suffered paralysis below the breastline following a myelogram and laminectomy and fusion. His action against the physicians resulted in a judgment based upon a directed verdict for the defendants which was affirmed on appeal. The medical evidence showed without contradiction that proper procedures were used by the physicians. Plaintiff's affliction was diagnosed as transverse myelitis, "about which little is known to medical science." Res ipsa loquitur was held not applicable because "the evidence demonstrates that appellant's affliction is of a kind not normally caused by negligence" and "is not associated in any way with negligent care by a physician,

and * * * bore no known consequential relationship to surgery such as was performed in the case at bar." 87 Idaho at 423. The case is, therefore, clearly distinguishable. It is to be observed that the Idaho Court recognized that in a proper case res ipsa loquitur may be invoked in a malpractice action, citing its prior decision in *Walker v. Distler,* 78 Idaho 38, 296 P2d 452 (paralysis suffered by a woman allegedly caused by the use of a spinal anesthetic preceding childbirth).

■ Emphasis is laid in defendant's brief on Dr. Smith's testimony. It is attacked as in part incompetent because the witness was not a neurological expert and is relied on in part as supporting the defendant's position. No objection was made to Dr. Smith's testimony because he was not qualified. He had had a large experience in the administration of spinal anesthetics. After his testimony was concluded the defendant moved to strike out that part of it which "related to any differential diagnosis" on the ground that "he is not a qualified neurologist, that he is not qualified to make differential diagnoses, * * *." Assuming the motion, thus narrowly phrased, should have been allowed, much of Dr. Smith's testimony, including that on the important issue whether paralysis and its symptoms following spinal anesthesia may ensue after the anesthetic has worn off, was competent.

■■ On a motion for a directed verdict all the evidence whether introduced by the plaintiff or the defendant, is to be considered and, of course, conflicting evidence is disregarded and the plaintiff is entitled to the benefit of every legitimate inference which may be drawn from the evidence. So considered, we think the conditions of the res ipsa loquitur rule are met. There is evidence—in this instance the testimony of experts

—that the injury suffered by the plaintiff is one that does not ordinarily occur in the absence of negligence; the instrumentality, namely, the anesthetic capable of causing the injury if improperly administered was in the exclusive control of the defendant, and there is no claim or suggestion that any voluntary action of the plaintiff was responsible for the injury.

■ It is not a case such as *Crewse v. Munroe,* 224 Or 174, 355 P2d 637, in which the evidence is evenly balanced as between two or more possible causes of the injury, nor one in which it can be properly determined that " the inference of fact was dispelled as a matter of law": *Gow v. Multnomah Hotel, Inc.,* supra, 191 Or at 65; rather, it was for the jury to decide whether it was more probable than not that plaintiff's paralysis was caused by the negligence of the defendant: *Kaufman v. Fisher,* supra, 230 Or at 639.

The motion for a directed verdict, therefore, was properly denied, and we are thus led to a consideration of the assignments of error.

■ Error is assigned to the giving of the following instruction:

"You are instructed that if you believe from the evidence in this case that the condition of which the plaintiff complains was caused by the disease of a myasthenia gravis type, or an infectious polyneuritis, or a radicular neuropathy, or any other disease or condition of the nerves or muscles which was either wholly coincidental with the birth of the child or was only indirectly related to the childbirth, then your verdict must be against the plaintiff and in favor of the defendant."

Plaintiff's exception was as follows:

"* * * We except also to XIII because it is a comment on the evidence, in the first place, and

in the second place, if not, there is no evidence to support it, and in any event, the Court submitted radicular neuropathy when there was no evidence of any witness in the case that it was considered that she had any such disease, nor is there any evidence in the case that any problem she is faced with could be related in any way to the childbirth."

We think the instruction was erroneous. There was evidence that the plaintiff's condition *was*—not that it was *caused by*—a disease of a myasthenia gravis type, and there is evidence that it was infectious polyneuritis. There is also a notation, apparently made by a doctor, dated November 12, 1960, in the University of Oregon Medical School Hospital record as follows: "typical sever[e] post infectious polyradicular neuropathy of just over 1 yr duration," but there is no reference in the testimony to this entry. Counsel for the defendant appear to argue that "polyradicular neuropathy" and "infectious polyneuritis" or "polyneuropathy" mean the same thing. This may be so, but no evidence in the record supports the assertion. "Neuropathy" we know means something wrong with the nerves. "Radicular" is defined as "Relating to a spinal nerve root, sensation felt along the course of a nerve." 7 Lawyers' Medical Cyclopedia (1962) (Glossary) 182. See, also, Stedman's Medical Dictionary, Unabridged Lawyers' Edition. We have no basis for saying that radicular neuropathy is the same disease as infectious polyneuritis and, in fact, the instruction, which was requested by the defendant, would indicate that it is a disease separate and distinct from the other two mentioned in the instruction. For all that can be determined from the record, radicular neuropathy may indicate a disease process in the spinal canal involving the nerve roots, the very condition which, according to Dr. Carter's testimony, was not present in the

plaintiff. But the point is that, in the absence of expert testimony explaining the precise nature of this disease and its causes, it is as though there was no evidence upon the subject, and this court cannot say that the introduction of this element into the case through the instruction was not prejudicial to the plaintiff.

As to the remainder of the instruction, there is no evidence in the record that plaintiff's condition was caused by any *other* disease or condition of the nerves or muscles than those previously mentioned. Thus, in a case dependent almost entirely on medical testimony, the cause of plaintiff's paralysis was put at large and the jury were left to speculate upon that crucial question without regard to the evidence. We do not understand what was intended to be conveyed by the reference in the instruction to a relation, coincidental or indirect, between the diseases expressly mentioned or any other hypothetical disease and childbirth. Counsel for defendant argue ingeniously that the instruction can be interpreted as favorable to the plaintiff, but we think that it was confusing and may readily have been taken by the jury as indicating that there was some causal connection between the birth of the child and plaintiff's paralysis, whereas there was none, other than that the impending birth furnished the occasion for the administration of the spinal anesthetic.

The instruction is also objectionable as tending in some measure to "present the facts," contrary to ORS 17.255(1). While not, perhaps, ground of reversal, it is similar to the instruction disapproved by this court in *DeWar v. First Nat. Bank of Roseburg*, 88 Or 541, 547, 171 P 1106. As we there said: "It is unfortunate that trial courts should indulge in this practice." Some

of our cases seem to be not in accord with the *Dewar* decision (see, e.g., *State v. High,* 151 Or 685, 51 P2d 1044), but we think the *Dewar* case correctly applied the statute. See, also, *Centennial Mills, Inc. v. Benson,* 234 Or 512, 521, 383 P2d 103; *Vollstedt v. Vista-St. Clair, Inc.,* 227 Or 199, 206-207, 361 P2d 657.

 Error is assigned to the giving of the following instruction:

"You are instructed that if you believe from the evidence in this case that the condition of which plaintiff complains was the result of a peculiar sensitivity of the plaintiff to the anesthetic used, but that the anesthetic itself was of a kind and employed in a manner approved by the ordinary careful and prudent obstetrician within this city, you should find your verdict in favor of the defendant and against the plaintiff."

Plaintiff excepted on the ground that there was no evidence that plaintiff was peculiarly sensitive to the anesthetic or that "such a condition would exist in any event."

A diligent search of the transcript fails to disclose any such evidence. Defendant points to none in his brief. He does attempt to justify the instruction by the following question put to Dr. Smith by counsel for defendant:

"If you assume, Doctor, let's assume a case where you might have an allergy or a sensitivity or something to a spinal. I don't know if there are such cases or not, but if you did have such a thing, what would you expect to show in the spinal fluid as a result of this?"

A question, of itself, does not constitute evidence. Even though the question had assumed that the plaintiff had "an allergy or a sensitivity" to a spinal—which it did not—it would still not be evidence of the

fact assumed. The instruction injected a false issue into the case and was prejudicial.

The errors just discussed require a reversal of the judgment and a new trial. Inasmuch as other questions raised by the assignments of error are likely to arise again, these will now be considered.

Plaintiff's hospital record at the University of Oregon Medical School Hospital was received in evidence without objection, save as to one entry, which purports to be the plaintiff's medical history as given by her husband on the day she was admitted to the hospital. The entry is headed *"History from Husband"* and contains, among other things, the following:

> "Patient's present illness started about 2 mo. ago at which time she first noticed some drooping of her eye lids esp. on the (L) and some numbness on the (L) side of her face. She was pregnant at this time. Then 3 days before she delivered she had a similar experience."

Plaintiff objected on the ground that the history was not taken from the plaintiff, but from Mr. Mayor. The objection was overruled and the ruling is assigned as error. The question turns upon the applicability of Oregon's Uniform Business Records as Evidence Act, ORS 41.680 and 41.690, which read:

> 41.680 "The term 'business,' as used in ORS 41.690, shall include every kind of business, profession, occupation, calling or operating of institutions, whether carried on for profit or not."

> 41.690 "A record of an act, condition or event, shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of

information, method and time of preparation were such as to justify its admission."

In Oregon, as elsewhere, hospital records are admissible in evidence when the conditions of the Uniform Act are met: *McReynolds v. Howland,* 218 Or 566, 573, 346 P2d 127; *Gallagher v. Portland Traction Co.,* 181 Or 385, 390, 182 P2d 354. Though there is some opinion to the contrary,[a] we think it the better rule that a patient's medical history in a hospital record is admissible, at least insofar as it is relevant to diagnosis and treatment, or, as the court put it in *Commonwealth v. Harris,* 351 Pa 325, 330, 41 A2d 688, is "pathologically germane to the physical or mental condition which caused the plaintiff to come to the hospital for treatment." See *McReynolds v. Howland,* supra (dictum); *Beth. Shipyard v. Scherpenisse,* 187 Md 375, 380-381, 50 A2d 256; *Erickson v. Commercial Casualty Ins. Co.,* 39 NYS2d 72, 265 App Div 327; *Cerniglia v. City of New York,* 49 NYS2d 447, 182 Miscl 441; *Roberto v. Nielson,* 288 NY 581, 42 NE2d 27; *Pollack v. Metropolitan Life Ins. Co.,* 138 F2d 123 (3d Cir. 1943); *Allen v. St. Louis Public Service Company,* 365 Mo 677, 285 SW2d 663, 55 ALR2d 1022; Richardson on Evidence (8th ed) 210. The reason for excluding history which is not relevant to diagnosis or treatment as, for example, the statement, "fell off streetcar, caught heel" (see *Green v. City of Cleveland,* 150 Ohio St 441, 83 NE2d 63), is that it is not in the regular course of business of a hospital to record such a statement. "It was the business of the hospital to diagnose the patient's condition and to treat him, not to record a statement derived from an unidentified source describing the manner in

---

[a] See McCormick on Evidence 611.

which the patient's injuries were sustained": *DelRe v. City of New York,* 42 NYS2d 825, 826, 180 Misc 525. See cases collected in Annotation, 44 ALR2d 553, at 559.

In New York, which has adopted the Model Act (which is similar to the Uniform Act and is designed to accomplish the same end: 5 Wigmore on Evidence (3d ed) § 1530 a) it was held in the leading case of *Johnson v. Lutz,* 253 NY 124, 170 NE 517, that the report of an accident made by a policeman who did not witness the accident, but obtained his information from bystanders who happened to be present at the scene of the accident when the policeman arrived, was not admissible in evidence because it was not made in the regular course of any business, profession, occupation or calling and was based on hearsay statements of persons who were under no duty to impart the information contained in the report. This decision is criticized in Wigmore op. cit., footnote 1, and in 30 Cornell Law Quarterly 449, 454, Current Developments in Pleading, Practice and Procedure in the New York Courts, by Harold R. Medina. Nevertheless, it has been generally followed by other courts, including this court: *Snyder v. Portland Traction Company,* 182 Or 344, 351, 185 P2d 563; see, also, *Sadjak v. Parker-Wolverine Co.,* 281 Mich 84, 88, 274 NW 719; *Standard Oil Company of California v. Moore,* 251 F2d 188, 214 (9th Cir. 1957); *D'Amato v. Johnston,* 140 Conn 54, 97 A2d 893, 38 ALR2d 772; Green, The Model and Uniform Statutes Relating to Business Entries as Evidence, 31 Tulane Law Review 49, 61-62. On the authority of *Johnson v. Lutz* the court in *Geroeami v. Fancy Fruit & Produce Corp.,* 291 NYS 837, 249 App Div 221, excluded a statement on a hospital record that "[h]e [the plaintiff] was intoxicated at the time."

The plaintiff was suing for damages caused by being struck by the defendant's truck. The reference to intoxication in the report was predicated upon information a doctor received from "[s]ome bystander there who claimed he brought the man into the hospital." The doctor could not identify the man who gave him the information and there was no evidence that the person who gave it was at the scene of the accident. The doctor testified that the plaintiff was not intoxicated.

However, the ground of the objection made by counsel for the plaintiff in this case was not that the history was inadmissible, as such, but that, as above stated, it was not taken from the plaintiff. Upon a similar question the Maryland Court of Appeals held in *Beth. Shipyard v. Scherpenisse,* supra, that under the Model Act "a hospital record containing the history of a plaintiff's case is admissible in evidence, whether or not the statements therein were made by the patient himself." 187 Md at 381. The opinion does not disclose the source of the information in that case. The Maryland Act contains a provision, not found in the Uniform Act, which reads: "All other circumstances of the making of such writing or record, * * * including lack of personal knowledge by the entrant or maker, may be shown to affect the weight, but not the admissibility thereof." The Maryland Court called attention to this provision, saying:

> "The purpose of the act is to put an end to narrowness in the use of the familiar rule of evidence that the person whose statement is received as testimony should speak from personal observation or knowledge, and to bring the rule of evidence nearer to the standards in responsible action outside of the courts. 5 Wigmore on Evidence (3d ed) § 1530 a." 187 Md at 381.

 There is no provision in the Uniform Act similar to that we have quoted from the Maryland Act, but the Uniform Act does vest a broad discretion in the judge to admit the record where the other requirements of the Act are complied with, "if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission." The act "should of course be liberally interpreted so as to do away with the anachronistic rules which gave rise to its need and at which it was aimed": *Palmer v. Hoffman*, 318 US 109, 63 S Ct 477, 87 L Ed 645, 144 ALR 719. See, also, *Smith v. Bear*, 237 F2d 79 (2d Cir. 1956), 60 ALR2d 1119; *Allen v. St. Louis Pub. Serv. Co.*, supra.

Turning now to the present case, Dr. Carter testified that the hospital records received in evidence were made at the time of the events recorded and in connection with the care and treatment of the patient, that it is customary to take the history of a patient upon admission to a hospital, that it is usually done by at least two separate doctors who are members of the trainee staff at the University of Oregon Medical School Hospital, that the history in this case was taken by Dr. Haugen, who was serving in the capacity of an intern at that time. The entry bears the date 11-27-59, the day the plaintiff was admitted to the hospital. It is the record of an act, condition or event; the information is relevant to diagnosis and treatment of the patient; a competent witness testified to its identity and the mode of its preparation and that it was made in the regular course of business at or near the time of the act, condition or event. "When those matters have been shown," we said in *Cascade Lbr. Terminal v. Cvitanovich*, 215 Or 111, 119, 332 P2d 1061, "as they were in the case at bar, the admissibility

of the record becomes a matter for the exercise of the trial judge's sound discretion * * *. If the trial judge resolves his discretion favorably to the proffered document, it is admissible."

█ Dr. Carter did not testify specifically whether the history is usually obtained from the patient. Presumably it is, at least where the patient is in condition to furnish it. In this instance, Dr. Carter testified, "the history, as must be, was obtained from the patient's husband." If, as the cases hold, a record of a relevant medical history obtained from a patient is so far deemed to be made in the regular course of the business of a hospital as to justify its admission in evidence, we are unable to see any reason why such a record obtained from the husband of a patient who accompanies his gravely ill wife to the hospital, should not be likewise admissible. The judge had discretion to evaluate the source of the information and this court cannot say that his determination was an abuse of discretion. If it should be argued that the husband's statement was not made "in pursuance of any duty" owing by him, *Johnson v. Lutz,* supra, the same argument might be urged against receiving the patient's statement. But if the statement by the patient is received on the theory that she had a duty to make it, then the circumstances may be such as to justify the judge in finding a similar duty on the part of the husband. This case is quite unlike several cited by the plaintiff: *Geroeami v. Fancy Fruit & Produce Corp.,* supra; *Snyder v. Portland Traction Co.,* supra, both involving hearsay statements of bystanders (as, indeed, does *Johnson v. Lutz*); *Stam v. Salles et al,* 223 Or 518, 355 P2d 93, where the record was excluded because no proper foundation for its admission was laid; *Lewis v. Merrill,* 228 Or 541, 365 P2d 1052, which

held inadmissible a part of a police officer's report because it was a mere statement of a conclusion; *United States v. Grayson,* 166 F2d 863 (2d Cir. 1948) involving hearsay information included in reports filed with a government agency. (Per Learned Hand, J.) The portion of the decision in *New York Life Insurance Co. v. Taylor,* 147 F2d 297, at 305 (DC Cir. 1958) relied upon by counsel for the plaintiff, does not deal with a history given by a patient and is not in point. The decision was by a divided court and the majority opinion seems to announce an unduly narrow construction of the Federal Shop Book Rule, which is patterned after the Model Act. See *Allen v. St. Louis Pub. Serv. Co.,* supra; Edmund Morgan, The Law of Evidence, 1941-1945, 59 Harvard Law Review 481, 564-565.

Plaintiff suggests that some of the facts stated in the hospital record were not within the personal knowledge of Mr. Mayor. However that may be, no objection was made on that ground. On another trial, if such an objection should be made, it will not be the duty of the judge "to sift out the wheat from the chaff." *Gallagher v. Portland Traction Co.,* supra, 181 Or at 391.

Mr. Mayor was a witness for the plaintiff in her case in chief. He denied on cross-examination that he talked to Dr. Haugen at the hospital and swore that he talked to a Dr. Gray. He also testified to a different version of the statement he made to Dr. Gray than that which appears in the hospital record. It is now contended that for these reasons the record is inadmissible. Again, no such objection was made in the trial court. We have no means of knowing what additional evidence may have been available to the defendant to meet such an objection had it been made,

or which may be available on another trial. In any event, we have been cited to no case which holds that if it is the reguar course of business for two employees to receive reports or obtain information, and one of them receives the report or obtains the information and the other records it, the record is, for that reason, inadmissible.

The objection to the portion of the hospital record in question was properly overruled. We need not go as far as the Maryland Court appears to have gone in *Beth. Shipyard v. Scherpenisse,* supra; we merely hold that in a proper case the relevant medical history of a patient in a hospital, furnished by someone other than the patient himself and recorded in the hospital record in compliance with the requirements of the Uniform Act, may be received in evidence, and that this is a proper case.

At the commencement of the trial the plaintiff asked leave to amend her complaint so as to allege negligence in the following particulars:

"(d) In failing to explain to plaintiff the dangers of a spinal anesthetic.

"(e) In failing to procure plaintiff's consent prior to administration of a spinal anesthetic.

"(f) In failing to secure a history from plaintiff to ascertain whether a spinal anesthetic could be administered to her with safety.

"(g) In failing to conduct a proper examination of plaintiff to ascertain whether a spinal anesthetic could be administered to her with safety."

The court disallowed (e) on the ground that it stated a new cause of action for assault and battery which was barred by the statute of limitations, more than two years having elapsed since the commission of the alleged tort. The other amendments were al-

lowed, but at the conclusion of the testimony the court removed them from the consideration of the jury. These rulings are assigned as error and, as they are related, will be considered together.

■ It may be stated as a general rule that a physician who performs an operation or administers treatment to which his patient has not expressly or impliedly consented is guilty of a technical battery: 41 Am Jur 220, Physicians and Surgeons § 108; 6 CJS 801, Assault and Battery § 8; Annotation, 56 ALR2d 695, at 697; 76 ALR 562. The rule was applied by this court in *Hively v. Higgs,* 120 Or 588, 253 P 363, 53 ALR 1052, where recovery as for a battery was sustained against a doctor who had been authorized by his patient to operate on the septum of her nose, but removed her tonsils while she was under an anesthetic. No negligence was alleged in that case. On the other hand, we held in *Gill v. Selling et al,* 125 Or 587, 267 P 812, 58 ALR 1556, that a doctor who, due to a mistake in identity, performed a spinal puncture test on the wrong person was liable for negligence. This was a clear case of an unauthorized operation; though the failure to obtain the patient's consent was due to a mistake, the operation was nonetheless a technical battery and, no doubt, had the plaintiff so chosen, that could have been made the basis of recovery instead of negligence.

*Hively v. Higgs* does not hold, as defendant contends, that the exclusive remedy for an unauthorized operation is assault and battery; the question was not presented.

■ In our opinion the requested amendment alleging an unauthorized use of a spinal anesthetic did not state a separate cause of action for assault and battery, but merely an additional specification of malpractice. The amendment is cast in terms of negligence.

Dr. Smith testified that it was the standard medical practice in the community to secure the patient's consent before administering a spinal anesthetic. Violation of that duty would be negligence or malpractice.

> "Malpractice, also sometimes called 'malapraxis,' means bad or unskillful practice, resulting in injury to the patient, and comprises all acts and omissions of a physician or surgeon as such to a patient as such, which may make the physician or surgeon either civilly or criminally liable." Herzog, Medical Jurisprudence, 153, § 180.

The act of a physician in performing an unauthorized operation is referred to in the authorities as a *technical battery*. It does not necessarily involve the kind of willful and intentional conduct that this court dealt with in *Denton v. Arnstein,* 197 Or 28, 250 P2d 407, where the defendant intentionally twice drove his automobile into the back of the plaintiff's automobile. Speaking with reference to that conduct we said: "An assault and battery is not negligence. * * * When defendant's conduct is wilful and intentional, it is no longer negligence, * * *." 197 Or at 45. But, if a physician should inadvertently (as in *Shehee v. Aetna Casualty & Surety Co.,* 122 F Supp 1 (WD La 1954)) fail to obtain the consent of his patient before performing an operation, the operation might constitute a technical battery, but it would still be a violation of the established standard of care and actionable as malpractice. See *Natanson v. Kline,* 186 Kan 393, 402, 350 P2d 1093, 187 Kan 186, 354 P2d 670.

As stated in 1 Wood on Limitations (4th ed) 202, § 57b:

> "Where plaintiff has several remedies for the same cause of action, the fact that one or more of his remedies have become barred will not affect his right to any of the others which are not barred."

In accordance with this principle the courts in the cases cited in the margin refused to hold that the statute of limitations governing assault and battery applied to a charge of unauthorized treatment by a physician.[9]

The court's ruling as to subparagraph (e) was not an exercise of discretion, but was based on an incorrect view of the law and was, therefore, erroneous: *Watson v. Dodson*, 238 Or 621, 395 P2d 866. Should a similar application to amend be made by the plaintiff upon the remand, it will be for the judge to allow or disallow it in the exercise of his discretion, in view of all the attendant circumstances.

■ The court's action in removing from the consideration of the jury subparagraph (d), which charged that the defendant failed to explain to plaintiff the dangers of a spinal anesthetic, was apparently based on the view that this also was a charge of assault and battery and, in addition that it was inconsistent with the charge of negligence in administering the anesthetic. What we have said about subparagraph (e) applies to the first point. As to the second, the charge of a violation of the duty of a physician to inform his patient of possible dangerous results from a proposed method of treatment or operation is not inconsistent with a charge of negligence in the administration of such treatment or the performance of such operation:

[9] Physicians' & Dentists' etc. Bureau v. Dray, 8 Wash 2d 38, 111 P2d 568; Maercklein v. Smith, 129 Colo 72, 266 P2d 1095; White v. Hirshfield, 108 Okla 263, 236 P 406; Burke v. Maryland, 149 Minn 481, 184 NW 32; Francis v. Brooks, 24 Ohio App 136, 143-144, 156 NE 609; McClees v. Cohen, 158 Md 60, 148 Atl 124. See, also, Bakewell v. Kahle, 125 Mont 89, 232 P2d 127; Klingbeil v. Saucerman, 165 Wisc 60, 160 NW 1051, 1 ALR 1311; Louisell and Williams, op. cit., paragraph 13.04; "A Reappraisal of Liability for Unauthorized Medical Treatment," by Allan H. McCoid, 41 Minn Law Rev 381, at 424, 434.

*Natanson v. Kline,* supra. See, as to inconsistency in pleading, *Pruett v. Lininger et al,* 224 Or 614, 620, 356 P2d 547.

Aside from the court's reasons for the ruling, no other contention in support of it is advanced by counsel for the defendant. The general rule regarding the duty of a physician to inform his patient of known dangers is not questioned. Upon that subject see the Annotation, 79 ALR2d 1028 and, with particular reference to the use of a spinal anesthetic, see *Hall v. United States,* 136 F Supp 187 (WD La 1955), affirmed 234 F2d 811. There is no suggestion in the brief of counsel for the defendant that the evidence was not sufficient to submit the question of an "informed consent" to the jury.

As to subparagraphs (f) and (g), counsel for the plaintiff have not challenged the action of the court in removing them from the consideration of the jury. As the evidence clearly would not have justified their submission, there was no error in the ruling.

Plaintiff excepted to the giving of the following instruction:

> "You are instructed that a doctor is not required to guard against or take measures to avert that which an ordinary careful and prudent doctor of the same class would not reasonably foresee under the same or similar circumstances."

The ground of the exception was: "If some harm is foreseeable, it is no defense that the particular harm might not have been foreseen * * *." It is not entirely clear that the instruction refers to a "particular harm" rather than harm in general. To avoid possible misunderstanding by the jury, however, we think that if an instruction of this character is to be given on another trial, it should, in appropriate language, em-

body substantially the rule as stated by this court in *Salmi v. Columbia & N.R.R. Co.,* 75 Or 200, 205, 146 P 819, LRA 1915D 834, and approved in *Danner v. Arnsberg et al,* 227 Or 420, 423, 362 P2d 758:

"If, under all the circumstances in the exercise of ordinary care, a person can discern that his act will naturally and probably result in harm of some kind to another, but not necessarily foreseen as to the exact form of injury, the former is liable in damages for the ensuing casualty."

 Exception was taken by the plaintiff to the withdrawal by the court of two allegations of negligence in the complaint. It is not necessary to set them forth, as they are duplications, though with greater detail and elaboration, of the allegation quoted at the beginning of this opinion and which the court submitted to the jury. This allegation was sufficiently definite and comprehensive to admit all the evidence tending to show negligence offered by the plaintiff. There was no error in the ruling.

Other assignments of error in the brief are not of sufficient merit to require discussion.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

DENECKE, J., specially concurring.

The majority holds that part of the hospital record containing the medical history of plaintiff, as stated by her husband, is admissible. I concur, except that in my opinion its admissibility involves more than the Uniform Business Records Act. That Act is an exception to the hearsay rule and obviates the necessity of calling the physician who took and recorded the history. However, there is another hearsay,—the

record is a statement of what another, the husband, said. The admissibility of this second hearsay is not necessarily governed by the Act. This issue would still be present if the physician who was told the history took the stand and testified to the history as given by the husband.

In my opinion the testimony of the physician taking the history is admissible and likewise the hospital record of such history is admissible. Both constitute another exception to the hearsay rule whether the history comes from the plaintiff patient or her husband. The exception is founded upon the premise that the giving of such statements under such circumstances creates a high probability of trustworthiness.

> "* * * A man goes to his physician expecting to recount all that he feels, and often he has with some care searched his consciousness to be sure that he will leave out nothing. If his narrative of present symptoms is to be received as evidence of the facts, * * * it can only rest upon his motive to disclose the truth because his treatment will in part depend upon what he says. * * *" L. Hand, J., in *Meaney v. United States*, 112 F2d 538 (2d Cir 1940), 130 ALR 973, 975-976.

This same "motive for truth" is in the husband when required to give his wife's medical history upon her admission to a hospital.

In *Malila v. Meacham*, 187 Or 330, 211 P2d 747 (1949), we permitted a dentist to testify to a dental history made to him by the plaintiff patient. (We only permitted such testimony as showing the basis of the dentist's diagnosis and not as proof of the facts stated.) We adhered to the distinction that a history so given is only admissible if made to a dentist or physician who is seen for the purpose of treatment

and is not admissible if given to a physician merely qualifying to testify at trial. While we do not state the ground for such a distinction, it seems clear that in the later case the "motive for truth" is not the same as in the case of a history given as a prelude to treatment.

O'CONNELL and GOODWIN, JJ., join in this specially concurring opinion.

O'CONNELL, J., concurring.

I join in Mr. Justice DENECKE's specially concurring opinion.

I also wish to register by disapproval of the manner in which the majority opinion deals with the problem of causation and negligence. The opinion states, "From the evidence that the defendant was negligent in failing to place a pillow under the plaintiff's head when the anesthetic was administered, in accordance with the standard practice, a legitimate inference might be drawn that this omission was the proximate cause of the injury sustained by the plaintiff, since this precaution is taken to avoid the danger of the anesthetic ascending the spinal canal." This states that an inference may be drawn from defendant's negligence to the conclusion that the negligence was the proximate cause of the injury. I recognize that this formula of negligence and "proximate cause" has the blessing of this court. I still insist as I did in *Dewey v. Klaveness*, 233 Or 515, 519, 379 P2d 560 (1963) that the use of the formula serves no good and invites confusion. I would state the problem in the present case as follows: Was the plaintiff's paralysis caused by the failure of defendant to put a pillow under plaintiff's head (i.e., was it a substantial factor

in bringing about this result) and if so, was defendant's conduct negligent?

If we, on this court, do not clarify our language and thinking with respect to negligence and causation, we cannot expect the trial courts to make an effort to do so and consequently the confusion that characterizes this area of the tort law is perpetuated.